**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **ERIC FLOYD,** | : | **PRISONER** |
| *Petitioner* | : | **CASE NO.  3:01CV1221(CFD)(WIG)** |
| | : | |
| **v.** | : | |
| | : | |
| **BRIAN MURPHY,** | : | **AUGUST 22, 2007** |
| *Respondent* | | |

<u>**RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION TO**</u>
<u>**THE PETITIONER'S APPLICATION FOR HABEAS CORPUS RELIEF**</u>

In this proceeding brought pursuant to 28 U.S.C. § 2254, the petitioner challenges a 1996 state court conviction for murder in violation of Connecticut General Statutes § 53a-54a(a), commission of a class A, B or C felony with a firearm in violation of § 53-202k, and criminal possession of a firearm in violation of § 53a-217.  In his amended petition [Doc. # 31], the petitioner claims that his state conviction is unlawful because:

(1)     The "trial court violated his Constitutional Due Process right to a fair trial by inadequately instructing the jury on the essential elements of the crime of accessory murder";

(2)     The "State violated his Constitutional rights by failing to disclose impeachment evidence pertaining to the testimony of two of the State's witnesses";

(3)     The "State violated his Constitutional rights by failing to timely disclose two statements";

(4)     The "State violated his Constitutional right by using perjured testimony to obtain a conviction and reiterated the perjury during closing argument";

(5)     The "State's Attorney made a missing witness argument during closing argument"; and

(6)     The petitioner's "attorney was constitutionally ineffective and his deficient performance actually prejudiced the defendant."

For the reasons set forth below, the petitioner is not entitled to federal habeas corpus relief and his petition for writ of habeas corpus must be dismissed.

## I.    PROCEDURAL HISTORY

This procedural history is compiled from documents forwarded as appendices to the respondent's Answer dated January 23, 2002, as follows:

Appendix A    Connecticut Supreme Court's decision on the petitioner's appeal; *State v. Floyd,* 253 Conn. 700, 756 A.2d 799 (2000)

Appendix B    Record on appeal

Appendix C    Petitioner's brief on appeal

Appendix D    State's brief on appeal

Appendix E    Petitioner's reply brief on appeal

Appendix F    Transcript of the criminal trial proceedings held on December 1, 4, 6, 7, and 8, 1995

Appendix G    Transcript of the criminal trial proceedings held on December 5, 1995

Appendix H    Transcripts of post-trial hearing held on August 17 and 31, 1998

Additionally, copies of the following documents are forwarded to the Court in support of this memorandum of law, as follows:

Appendix I    Connecticut Appellate Court's decision on the petitioner's appeal from the state habeas court; *Floyd v. Commissioner of Correction,* 99 Conn. App. 526, 914 A.2d 1049 (2007)

Appendix J    Record on appeal from the decision of the state habeas court

Appendix K    Petitioner's brief on appeal from the decision of the state habeas court

Appendix L    Respondent's brief on appeal from the decision of the
              state habeas court

Appendix M    Petitioner's reply brief on appeal from the decision of the
              state habeas court

Appendix N    Petitioner's petition seeking discretionary review by the
              Connecticut Supreme Court

Appendix O    Connecticut Supreme Court's decision denying
              discretionary review; *Floyd v. Commissioner of Correction*,
              282 Conn. 905, 920 A.2d 308 (2007)

"On April 11, 1994, the Bridgeport police arrested the [petitioner]. The [petitioner] subsequently was charged with the murder of the victim in violation of § 53a-54a (a), the attempted murder of [Alex Delgado] in violation of General Statutes §§ 53a-49 and 53a-54a (a), commission of a class A, B or C felony with a firearm in violation of § 53-202k, and criminal possession of a firearm in violation of § 53a-217." (Footnotes omitted.) *State v. Floyd,* 253 Conn. 700, 705, 756 A.2d 799 (2000). On December 8, 1995, "at the conclusion of the trial, the jury rendered a verdict of guilty of the crimes of murder, commission of a class A, B or C felony with a firearm, and criminal possession of a firearm, and not guilty of the crime of attempted murder." *Id.*; Appendix F at 435-38. On January 26, 1996, the "trial court sentenced the defendant to a total effective term of imprisonment of fifty-five years." Appendix B at 2, 14, 24a.

The petitioner appealed to the Connecticut Supreme Court. On July 25, 2000, that Court affirmed the judgment of conviction. *State v. Floyd,* 253 Conn. 700, 756 A.2d 799 (2000) (hereinafter *"Floyd I"*).

In June 2001, the petitioner filed a petition for writ of habeas corpus with this Court, initiating the instant proceedings. On or about April 4, 2002, the respondent filed an

Answer and a Memorandum of Law in Opposition to the Petitioner's Application for Habeas Relief. Thereafter, the petitioner sought a stay in these proceedings so that he could return to the state courts of Connecticut and raise several new claims. On March 5, 2003, the Court granted the petitioner's motion for a stay.

The petitioner sought relief from the state habeas court. After a hearing on the merits of the petitioner's claims, the state habeas court denied relief. The petitioner appealed. On February 13, 2007, the Connecticut Appellate Court affirmed the judgment of the state habeas court. *Floyd v. Commissioner of Correction,* 99 Conn. App. 526, 914 A.2d 1049 (2007) (hereinafter *"Floyd II"*). The petitioner then sought discretionary review by the Connecticut Supreme Court. On April 12, 2007, the Connecticut Supreme Court denied such review. *Floyd v. Commissioner of Correction*, 282 Conn. 905, 920 A.2d 308 (2007).

Meanwhile, the petitioner returned to this Court by filing an amended petition dated February 25, 2007; *see* Petition [Doc. # 31]; and a motion to lift the stay. On March 19, 2007, that motion was granted by the Court and the respondent was directed show cause why the relief requested in the petition should not be granted.

## II.    STATEMENT OF FACTS[1]

The Connecticut Supreme Court determined that a jury could reasonably have found the following facts:

> In the very early morning on January 21, 1994, Alex Delgado and the victim, Jose Avellanet, were walking on Clinton Avenue in Bridgeport when they were approached by the defendant, who held what appeared to be a nine

---

[1]    The factual findings of state courts are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).

millimeter gun.  Delgado had known the defendant for several years.  The defendant asked Delgado and the victim what they were doing there. Delgado responded that they "were just walking up the street."   As the defendant accused Delgado and the victim of being there to rob him, Delgado was punched in the back of his head and knocked to the ground. Simultaneously, Delgado became aware of the presence of another person, whom he did not recognize and who was not identified during the defendant's trial.  Delgado stood up and again told the defendant and the unidentified person that he and the victim were just walking on the street, and then asked the defendant and the unidentified person to let him and the victim leave.  The defendant then fired his gun three or four times at the ground near Delgado's feet.  Delgado then offered the defendant money and again asked the defendant to let him and the victim leave.  The defendant took Delgado's money and jewelry, and the unidentified person took the victim's money.

Shortly thereafter, the defendant called out the name "Mickey," and two men, who were farther up Clinton Avenue and whom Delgado could not identify, started running down the street toward Delgado and the others.  At that point, Delgado turned and ran in the opposite direction.  As he was running, he heard three or four gunshots flying and ricocheting around him.  Delgado also heard the defendant shouting at him, demanding that he come back and stating that he knew where Delgado lived.  Delgado ran around a corner and, at that point, could no longer see the defendant or the victim.  Two other eyewitnesses, however, saw the defendant and Mickey fire multiple gunshots at the victim as he lay on the ground, after Delgado ran away.

Later that morning, John Corriss and Bruce Doherty, paramedics with the Bridgeport ambulance service, received an emergency call to proceed to Clinton Avenue between Railroad and State Streets.  When they arrived at the location, they found the victim lying on the ground and observed that he had sustained multiple gunshot wounds.  The paramedics then determined that the victim had ceased breathing and had no pulse.  A subsequent autopsy revealed three gunshot wounds, one of which actually caused the victim's death and another of which potentially was fatal.  The medical examiner recovered a nine millimeter bullet from the victim's body.  The police recovered four spent nine millimeter cartridge casings, two spent .45 caliber casings and two .45 caliber bullets from the crime scene.  Edward McPhillips, a criminalist with the Connecticut State Police Forensic Science Laboratory, specializing in the examination of firearms, testified that he believed that the bullets and casings were fired from at least four different weapons.

*Floyd I,* 253 Conn. at 703-05.

5

## III.    ARGUMENT

In his amended petition for writ of habeas corpus, filed with this court on March 8, 2007, the petitioner challenges his 1996 conviction on multiple grounds.  For the reasons set forth below, the petitioner is not entitled to federal habeas corpus relief and his petition for writ of habeas corpus must be dismissed.

### A.    Standard Of Review

Pursuant to 28 U.S.C. § 2254(d)(1), a writ of habeas corpus "may issue only if one of the following two conditions is satisfied--the state-court adjudication resulted in a decision that (1) 'was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.'"  *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).[2] The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta," of the High Court's "decisions as of the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412, 120 S.Ct. at 1523.

A state court decision is "contrary to" clearly established Federal law if it falls within one of two scenarios.  Under the first scenario, a state-court decision will be contrary to "clearly established precedent if the state court applies a rule that contradicts the governing

_____

[2]    Justice O'Connor delivered the opinion of the Court with respect to Part II in which it determined that the Antiterrorism and Effective Death Penalty Act (AEDPA) modified the role played by federal habeas courts in reviewing petitions filed by state prisoners and interpreted § 2254(d)(1).  Justice Stevens delivered the opinion of the Court with respect to Parts I, III, and IV.

law set forth in our cases." *Williams*, 529 U.S. at 405, 120 S.Ct. at 1519.  As for the second scenario, the Court explained that a "state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 406, 1519-20.

If a state-court decision is not "contrary to" U.S. Supreme Court precedent, the federal habeas court must determine whether the state court's decision involved an "unreasonable application" of clearly established Federal law.  In so doing, a federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409, 120 S.Ct. at 1521.  Thus, courts must apply an objective standard.  An "*unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410, 1522.  "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411, 1522.

Once this standard is applied to the claim raised by the instant petitioner, it becomes clear that federal habeas corpus relief is unwarranted and the petition must be dismissed.

### B.    The Trial Court's Instructions to the Jury Did Not Violate Clearly Established Federal Law

The petitioner first claims that the trial court violated his constitutional rights by "inadequately instructing the jury on the essential elements of the crime of accessory murder."  Petition [Doc. # 31] at 1.  In support of this claim, he argues that the instructions

were "misleading and confusing when they instructed the jury that it is of no consequences

that the evidence may not clearly establish that the death of Jose Avellant was caused by

the defendant or any accomplice, you can still find him guilty."  Petition [Doc. # 31] at 3.

Before the state courts, he asserted that the improper instruction violated his right to due

process and implicated the fairness of his trial.  Appendix C at 10.  The Connecticut

Supreme Court, however, disagreed.  That decision did not constitute an unreasonable

application of clearly established federal law as determined by the Supreme Court of the

United States.  As a result, federal habeas corpus relief is unwarranted.

### 1.    Decision of the Connecticut Supreme Court

The Connecticut Supreme Court resolved the petitioner's claim, as follows:

> The defendant . . . claims that the trial court's instruction that "[i]t is of no
> consequence that the evidence may not clearly establish that the death of
> [the victim] was caused by the defendant, or any accomplice," could have
> misled the jury to believe that it could find the defendant guilty of murder
> even if the state proved neither that the defendant had killed the victim nor
> that an accomplice had done so.

> * * *

> Our standard of review for claims of instructional impropriety is well
> established.  "[I]ndividual jury instructions should not be judged in artificial
> isolation, but must be viewed in the context of the overall charge. . . . *State
> v. Cooper,* 227 Conn. 417, 444, 630 A.2d 1043 (1993).  The pertinent test is
> whether the charge, read in its entirety, fairly presents the case to the jury in
> such a way that injustice is not done to either party under the established
> rule of law. . . . *State v. Figueroa,* 235 Conn. 145, 170, 665 A.2d 63 (1995).
>  Thus, [t]he whole charge must be considered from the standpoint of its
> effect on the [jurors] in guiding them to the proper verdict . . . and not
> critically dissected in a microscopic search for possible error. . . . *State v.
> Anderson,* [supra, 212 Conn. at 37, 561 A.2d 897].   Accordingly, [i]n
> reviewing a constitutional challenge to the trial court's instruction, we must
> consider the jury charge as a whole to determine whether it is reasonably

possible that the instruction misled the jury. . . . *State v. Lemoine,* 233 Conn. 502, 509, 659 A.2d 1194 (1995)."  (Internal quotation marks omitted.)  *State v. Diaz,* supra, 237 Conn. at 536-37, 679 A.2d 902.

* * *

We . . . reject the defendant's argument that the trial court's instruction that "[i]t is of no consequence that the evidence may not clearly establish that the death of [the victim] was caused by the defendant, or any accomplice," could have misled the jury to believe that it could find the defendant guilty of murder even if the state did not prove that either the defendant or an accomplice had killed the victim.  In light of the entire charge, it is not reasonably possible that the jury understood the challenged instruction to mean that it could convict the defendant of murder even if it found that the victim was killed by neither the defendant nor an accomplice, as that term was explained by the court, but by some other person.  In particular, in the instructions immediately preceding the challenged language, the trial court charged the jury that if it "simply [doesn't] know which [person caused the fatal injury], whether it was Mickey and/or the defendant, *but . . . w[as] satisfied beyond a reasonable doubt it was one or the other,* that would constitute proof."  (Emphasis added.)  The trial court subsequently charged the jury that, "if . . . you are satisfied that . . . both this defendant and Mickey had the intent to cause the death, or in the manslaughter charges, to cause serious physical injury, the fact that you cannot specifically [co]nclude which one fired the fatal shot would not prevent you from finding the defendant here guilty as a principal," that "[i]f any person committed the crime charged, that is, it was the gun of either that person or of another person, and they were acting in concert with each other, [the jury] could find the person guilty as charged on an accessorial theory," and that, if the testimony "convinces [the jury] beyond a reasonable doubt that this defendant either actually caused the death of [the victim], or that he was an accessory to Mickey in causing the death of [the victim], he would be guilty, at least of that particular element of causing the death would have been proven."   When the challenged portion of the court's instructions is taken in context, the most reasonable understanding of it is that the jury could convict the defendant of murder, even if it could not determine whether the fatal gunshot wound was inflicted by the defendant or by an accomplice, and that it must be convinced beyond a reasonable doubt that it was one or the other that inflicted the fatal gunshot wound.  Therefore, the instruction, taken as a whole, was proper. See *State v. Delgado,* 247 Conn. 616, 627, 725 A.2d 306 (1999) (" 'persons acting with the mental state required for commission of murder, who

intentionally aid one another to engage in . . . such conduct . . . are accessories' " even if it cannot be determined beyond reasonable doubt who fired fatal shot); *State v. Roseboro,* 221 Conn. 430, 437 n. 6, 604 A.2d 1286 (1992) (recognizing that "[i]t is of no consequence that the evidence does not clearly establish which of the killings were committed by the defendant and which were done by his accomplice").

(Footnotes omitted.)  *Floyd I,* 253 Conn. at 705-18.

### 2.    When read in context, the trial court's instructions were proper

The fact that an "instruction was allegedly incorrect under state law is not a basis for habeas relief."  *Estelle v. McGuire,* 502 U.S. 62, 71-72, 112 S.Ct. 475, 481-82, 116 L.Ed.2d 385 (1991).  Rather, the only appropriate question to be addressed by a federal court is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. . . ." (Citations omitted; quotation marks omitted.) *Estelle v. McGuire,* 502 U.S. at 72, 112 S.Ct. at 482.  In the instant case, the Connecticut Supreme Court already has resolved any questions of state law against the petitioner. Thus, the only remaining issue is whether the instruction offends due process.

Before a federal court may overturn a conviction on the basis of an improper instruction, however, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).  In making this determination, an instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record. . . ." (Citation omitted.) *Estelle v. McGuire,* 502 U.S. at 72, 112 S.Ct. at 482.

Before the state courts, the petitioner argued that the challenged instruction "misled the jury to believe that it could find the defendant guilty of murder even if the state did not prove that *either* the defendant or an accomplice had killed the victim." (Emphasis added.) *Floyd I,* 253 Conn. at 717. Likewise, in the instant proceeding, the petitioner contends that the trial court's instructions on accessorial liability were "misleading and confusing when they instructed the jury that it is of no consequences that the evidence may not clearly establish that the death of Jose Avellant was cause by the defendant or any accomplice, you can still find him guilty." Petition [Doc. # 31] at 3. Contrary to that position, the Connecticut Supreme Court determined that the instruction was proper when "taken in context." *Floyd I,* 253 Conn. at 718. In context, the challenged language instructed the jury that it could "convict the defendant of murder, even if it could not determine whether the fatal gunshot wound was inflicted by the defendant or by an accomplice" so long as the jury was "convinced beyond a reasonable doubt that it was one or the other that inflicted the fatal gunshot wound." *Id.* Thus, no danger existed that the jury found the petitioner guilty even though "the evidence did not establish that either he or an accomplice killed" the victim. Appendix C at 13. Rather, the jury was instructed that it had to find that the petitioner "either actually caused the death of [the victim], or that he was an accessory to Mickey in causing the death of [the victim]" before it could convict him. *Id.*

Given that the trial court properly instructed the jury, the petitioner cannot demonstrate that the instructions resulted in a due process violation or that they constituted an unreasonable application of clearly established federal law. As a result, his claim will not support federal habeas corpus relief.

**C.    The Connecticut Supreme Court's Resolution of the Petitioner's *Brady* Claim Does Not Constitute An Unreasonable Application of Federal Law**

Next, the petitioner claims that the State failed to disclose certain evidence that would have impeached two of its witnesses.  For the reasons set forth below, the Connecticut Supreme Court's application of *Brady v. Maryland* was not unreasonable. Therefore, the petitioner's claim must fail.

**1.    State court's resolution of the petitioner's claim**

On direct appeal, the Connecticut Supreme Court made the following factual findings relevant to the petitioner's claim:

> On June 28, 1994, the defendant filed a motion for discovery and inspection requesting, inter alia, disclosure of exculpatory information or materials, the names and addresses of the state's trial witnesses, prior felony convictions of and pending felony and misdemeanor charges against any state witness, and "any inducement or reward offered to a witness or [codefendant] in return for [his] testimony. . . ."  On August 23, 1994, the state responded that the names and addresses of witnesses and the charges against them would be disclosed at trial.  At trial, the state called Younger as a witness.  The state's attorney represented at oral argument before this court that, before Younger testified at trial, the state disclosed Younger's arrest record, which showed Younger's arrest history, the pending drug charges against him and his probation status at the time of his testimony.
>
> Younger testified at trial that, on the night of January 20, 1994, he and the defendant, as well as several others, were selling drugs together on Clinton Avenue.  Younger left the street at about 9:30 p.m. In the very early morning on January 21, 1994, Younger was sleeping at his home on Clinton Avenue when he heard someone outside yell, "stop that guy."  Younger recognized the voice and identified it as that of a person named "Reggie."  Younger went to his window and then heard Reggie say, "Fugi, stop that guy," and someone else say, "get down."   He then saw the defendant and another person, whom Younger did not recognize, crossing the street toward Younger's house.  Younger testified that he then heard a gunshot from under his window.  He could not see who fired the shot because his view was obstructed by an overhanging roof.  Thereafter, Younger saw a group of people, including Fugi and Mickey, running up the street toward the

12

defendant.  At the same time, the person who had been crossing the street with the defendant ran down Clinton Avenue in the opposite direction.

Younger also testified that he saw someone lying on the ground about thirty feet from his window, and that, after Mickey came up the street, he fired several gunshots at that person.  Younger testified that he also saw the defendant fire gunshots at the person on the ground.  After the shooting, Younger's wife called 911, and an ambulance arrived at the scene shortly thereafter.  Younger testified that he did not see any police at the scene on the night of the shooting, and that he did not give any information to the police about the shooting at that time because he was afraid.  The day after the shooting, he went to North Carolina for several days.

On cross-examination, Younger testified that he had been arrested in June, 1994, for possession of narcotics with intent to sell.  During a police interview in connection with those charges, Younger told the police that he had information about the January 21, 1994 shooting.  Subsequently, Younger gave a statement to the police about the shooting.  The defendant was provided with a copy of that statement at trial, and defense counsel questioned Younger about the circumstances under which it was made.

Younger testified that, at the time of his arrest, he did not ask the police for any consideration in exchange for the information, and that he believed that "the police can't make deals for you in court."  Younger also testified that he had four or five prior criminal convictions, including a conviction for first degree robbery, and that, at the time of his testimony, he was not being held in jail pending disposition of the drug charges.  He further testified that he did not know whether the reason why the charges had not been disposed of was that the state was waiting to see what happened in the defendant's trial.  Younger testified that, as of the time of his testimony, the state had not made him a plea offer.

Two other eyewitnesses to the killing, Reginald Barry and Delgado, also testified for the state.  Barry claimed not to have remembered seeing the defendant on the night of the killing, and, when shown his prior sworn statement to the police concerning the killing, claimed that he could not remember making it because he had been intoxicated when he made the statement.  The statement was admitted into evidence as a prior inconsistent statement under *State v. Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 598 (1986) ("allowing the substantive use of prior inconsistent statements, signed by the declarant, who has personal knowledge of facts stated, when the declarant testifies at trial and is subject to cross-examination").  Our review of the record and transcripts shows that Barry's statement and Delgado's testimony were substantially consistent with each other and with Younger's testimony.

13

During closing arguments, defense counsel argued that Younger's expectation that he would receive favorable treatment from the state with respect to his pending drug charges in exchange for his testimony in this case made his testimony unreliable. In rebuttal, the state's attorney argued that there was no evidence of a deal between the state and Younger by which Younger would receive favorable treatment in connection with his pending drug charges in exchange for his testimony. The trial court charged the jury that it could consider whether Younger was expecting favorable consideration in exchange for his testimony in deciding whether Younger had any bias, interest or motive to testify falsely.

After the defendant was convicted, the defendant's appellate counsel obtained information concerning the disposition of the drug charges against Younger, which, the defendant claims, showed that Younger had, in fact, received favorable treatment from the state in the criminal proceedings against him as of the date of his testimony in this case. Specifically, appellate counsel learned that the state had not prosecuted Younger for a violation of his probation in connection with his June 21, 1994 arrest, and that the state had not opposed the reduction of Younger's $50,000 bond to a promise to appear. Appellate counsel also obtained evidence that, according to the defendant, shows that Younger received favorable treatment from the state after his testimony in this case. Specifically, appellate counsel learned that, at the February 2, 1996 sentencing hearing in Younger's drug case, which occurred approximately two months after Younger's trial testimony in this case, the state indicated that it was filing a substitute information charging Younger with only one count of possession with intent to sell narcotics. Younger pleaded guilty to that charge, and the state recommended a five year prison sentence, execution suspended, and three years probation with special conditions. The trial court imposed the recommended sentence.

After filing an appeal in this case pursuant to § 51-199(b)(3), the defendant filed in this court a motion for rectification or augmentation of the trial court record pursuant to what are now Practice Book §§ 66-5, 61-10 and 60-2(1) and (9). In his motion, the defendant requested "an evidentiary hearing . . . to determine whether a plea [agreement] between the state and . . . Younger . . . [had been] disclosed to the trial court and to defense counsel [before Younger had testified], or whether its true nature was disguised or not disclosed . . . and whether Younger received other consideration from the state before the defendant's trial in return for Younger's anticipated testimony, and if so, whether such consideration was disclosed ... and whether, as planned, Younger received other consideration from the state after the defendant's trial in return for Younger's testimony."

14

* * *

On August 17 and 31, 1998, the trial court conducted an evidentiary hearing in compliance with this court's order. Among the documents produced by the state at the hearing was the state's attorney's Part B file of the pending drug charges against Younger. Joseph Marcello, the supervisory assistant state's attorney in Part B of the Superior Court in the judicial district of Fairfield, identified the handwriting in the file as his own, and testified as to the contents of the file. The file contained numerous notations by Marcello documenting instructions from his superior, Donald A. Browne, then the state's attorney for the judicial district of Fairfield, concerning Younger's case. These notations included the following: (1) June 24, 1994, "Sergeant Sherbo–[Younger] gave good info on 2 murders [and] will notify [state's attorney] Browne per his instructions"; (2) June 27, 1994, "[s]tate will do nothing without detailed written letter"; (3) August 8, 1994, "[state's attorney] Browne says--release on PTA [promise to appear] (the case that [Younger] is going to testify on is still pending). DO NOT dispose until consulting Part A"; (4) November 23, 1994, "[s]poke with [state's attorney] Browne on this case. Continue until the end of January [and][d]o not dispose without seeing me (Joe M[arcello] ). I have to consult with [state's attorney] Browne before disposing"; (5) March 15, 1995, "[s]poke with [state's attorney] Browne--[h]e instructed us NOT to dispose of this file until the Part A case is over. ([Younger] is to testify in Part A case). He said to continue 2 more months"; and (6) January 23, 1996, "[s]poke with [state's attorney] Browne. [Younger] was an 'outstanding' witness in a murder case [and] testified for [C. Robert] Satti [Jr., the state's attorney representing the state at trial, and] helped obtain a conviction. Because of [Younger's] cooperation ... 5 yrs E/S; 3 yrs Prob [five years imprisonment, execution suspended, three years probation and] terminate present probation. S.C. drug E & T [special condition, drug evaluation and treatment]."

At the hearing, the state also produced a letter, dated September 28, 1994, from Younger's attorney, Catherine E. Teitell, and addressed to Browne, which stated in relevant part: "[An assistant state's attorney from Part B] suggested a long continuance in this case for the purpose of speaking with you regarding a disposition in light of . . . Younger's cooperation in the investigation of one of your cases in Part A. . . . [Younger] presents himself as a mature, respectful, educated, well-spoken man of thirty three and will make an excellent witness for you if called upon in the future to testify." The defendant's appellate counsel indicated at the hearing that he had never seen the letter before. The assistant state's attorney represented that the letter had been given to him on the morning of the hearing and that the letter had "ended up in [Younger's Part B] file eventually."

The following relevant testimony was elicited at the hearing: Teitell testified that she believed that she had discussed with Younger her letter to Browne, and that she and Younger "always spoke in terms of eventually achieving a plea agreement." Teitell testified that she never received any response to the letter. She also testified that she told Younger that his cooperation as a witness in this case could lead to favorable consideration in his drug case. She testified that there was no specific plea agreement with the state, but that there was "obviously a hope" for such an agreement. She acknowledged that no prosecutor ever had said to her that the state would be lenient with Younger in exchange for his testimony; rather, she had a "good faith basis" for her hope for favorable treatment because the state repeatedly had agreed to continuances in Younger's case, and had not objected to the reduction of Younger's $50,000 bond to a promise to appear. Teitell also testified that she believed that Browne's recommendation "went a long way in connection with [Younger's] probation status problem." Finally, Teitell testified that, while Younger's drug charges were pending, "he was doing well at work, he was doing well on probation . . . [and] he was . . . doing well in his family life."

At the hearing, Browne testified that he had no specific recollection of the facts of Younger's case. He also testified that, generally, he would want to make certain that the charges against a defendant who also was a witness in another case were not disposed of prior to the witness' testimony because "as long as that case [against the witness] was pending, his incentive to be a truthful witness would be greater"; the witness would have such an incentive because his truthful testimony could be brought to the attention of his sentencing judge, "and judges often give that some consideration in imposing a sentence." Browne also testified that he assumed that the reason for the state's recommendation for the reduction of bond to a promise to appear in Younger's case was Younger's willingness to testify. Browne further testified that it was his common practice to instruct state's attorneys in the judicial district of Fairfield to avoid making a specific plea agreement in situations in which a defendant is cooperating as a witness in another case because, among other reasons, "once you get into specifics, then you'd run into the risk [that] somebody later on is in disagreement on what the specifics are," and because "there were too many unknowns." Browne testified that he would, however, indicate to the testifying defendant's attorney that the defendant's cooperation would be brought to the attention of the sentencing judge. When asked if one reason for the policy against entering into plea agreements was that the existence of such an agreement would detract from the credibility of a witness, he could not "say that it wasn't something that may have occurred to [him] in certain cases."

Satti also testified at the hearing. Satti testified that he determined that there was no plea agreement between Younger and the state by asking Younger

if there was such an agreement. He did not ask any of the state's attorneys involved in Younger's case whether such a plea agreement existed. Satti also testified that he first saw Teitell's letter to Browne about six months before the hearing, and that he made no attempt to disclose it to counsel for the defendant at that time.

Based on the foregoing evidence, the trial court concluded that there was no implied plea agreement between the state and Younger.

The defendant claims on appeal that the state violated his right to due process by failing to disclose the following: (1) that there was an implied agreement between the state and Younger that he would receive favorable treatment in exchange for his testimony; (2) that, assuming there was no implied agreement, there was an informal understanding that Younger would receive favorable treatment; and (3) that, assuming there was no implied plea agreement between the state and Younger, there was undisclosed impeachment evidence relating to Younger's testimony.

The law governing the state's obligation to disclose exculpatory evidence to defendants in criminal cases is well established. "The defendant has a right to the disclosure of exculpatory evidence under the due process clauses of both the United States constitution and the Connecticut constitution. *Brady v. Maryland,* 373 U.S. 83, 86, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *State v. Simms,* 201 Conn. 395, 405 & n. 8, 518 A.2d 35 (1986). In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material." (Internal quotation marks omitted.) *State v. Correa,* 241 Conn. 322, 360-61, 696 A.2d 944 (1997).

"It is well established that [i]mpeachment evidence as well as exculpatory evidence falls within *Brady's* definition of evidence favorable to an accused. . . . *State v. McPhail,* 213 Conn. 161, 167, 567 A.2d 812 (1989); see also *State v. White,* 229 Conn. 125, 135, 640 A.2d 572 (1994)." (Internal quotation marks omitted.) *State v. McIntyre,* 242 Conn. 318, 323, 699 A.2d 911 (1997); see also *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A plea agreement between the state and a key witness is impeachment evidence falling within the definition of exculpatory evidence contained in *Brady. State v. McIntyre,* supra, at 323, 699 A.2d 911.

We first consider whether there was an undisclosed, implied plea agreement between Younger and the state. The existence of an undisclosed plea agreement is an issue of fact for the determination of the trial court. See

17

*State v. Satchwell,* 244 Conn. 547, 562, 710 A.2d 1348 (1998) (defendant is required to seek determination by trial court of fact-based claim of undisclosed agreement). Furthermore, the burden is on the defendant to prove the existence of undisclosed exculpatory evidence. See *State v. Simms,* supra, 201 Conn. at 407, 518 A.2d 35 (noting that defendant had failed to prove existence of undisclosed exculpatory evidence).

\* \* \*

We conclude that the trial court reasonably could have found, based on the evidence presented, that there was no implied plea agreement between Younger and the state. The trial court found that the evidence, including information contained in Younger's Part B file and Teitell's letter to Browne, established a connection between Younger's willingness to testify and the state's willingness not to oppose a reduction of his bond to a promise to appear and to continue the proceedings until after Younger's testimony in this case. That connection is not, however, sufficient to compel a finding that there was an implied plea agreement, especially when other evidence presented at the hearing militated against such a finding. Teitell testified that she had no knowledge of any specific plea agreement, but, rather, that she hoped that Younger's testimony would lead to such an agreement. Browne testified that he had no specific recollection of Younger's case. He also testified, however, that, although it was his practice to indicate to the attorney for a cooperating witness that the cooperation would be brought to the attention of the sentencing court, he generally does not enter into specific plea agreements in such cases. He testified that one reason for this policy is that "there are too many unknowns" for the state to commit itself to a plea agreement on the sole basis that the defendant has agreed to testify in another case.

The trial court also found that Younger ultimately received a relatively lenient sentence, partly because of his cooperation in this case. That finding also is not sufficient to compel a conclusion that there was a plea agreement at the time of Younger's testimony. None of the evidence indicates that Younger had received any commitment from the state that his testimony would lead to a lenient sentence. At most, he had a hope for leniency.

Considering all of the evidence, a reasonable fact finder would not be compelled to conclude that there was an implied plea agreement between Younger and the state. Accordingly, we conclude that the trial court's factual finding that there was no such implied agreement must stand.

The defendant next claims that, even if there was no implied plea agreement between Younger and the state, there was an undisclosed, informal understanding that Younger would benefit from testifying as a state's witness

18

against the defendant. This claim is conceptually inseparable from the defendant's claim that the state failed to disclose impeachment related evidence. Under the circumstances of this case, if any alleged undisclosed evidence constituted impeachment evidence, it is only because the evidence suggested that there was such an informal understanding. Accordingly, we will consider these claims together.

The defendant claims that the state improperly failed to disclose its lack of opposition to the reduction of Younger's $50,000 bond to a promise to appear and its decision not to prosecute Younger for a violation of his probation based on his June, 1994 arrest, both of which indicated that Younger had received a benefit from the state in exchange for his testimony. The defendant also contends that the existence of an informal agreement that Younger would receive a benefit from testifying may be inferred from both the contents of Teitell's letter to Browne and from the information contained in Younger's Part B file, neither of which was disclosed prior to trial. The defendant contends that all of this evidence constituted impeachment evidence because it showed that Younger had a motivation to give testimony favorable to the state.

The state conceded at oral argument that it never disclosed to the defendant that it had not opposed Younger's request for a reduction of a $50,000 bond to a promise to appear. Nor did it disclose Teitell's letter. The state's attorney who represented the state at trial explained at oral argument that he had not been aware of the state's lack of opposition to the bond reduction at the time of the defendant's trial, and that the letter from Teitell was not in his files until after the defendant was convicted. He concedes, however, that this would not excuse nondisclosure of the information. See *Demers v. State*, 209 Conn. 143, 153, 547 A.2d 28 (1988) (where police department possessed exculpatory material, prosecutor had constructive possession thereof, for purposes of *Brady*, inasmuch as "[t]he [s]tate's duty of disclosure is imposed not only upon its prosecutor, but also on the [s]tate as a whole" [internal quotation marks omitted]). The state's attorney also represented at oral argument that, if he had been aware of this information at the time of trial, he would have disclosed it. The state concedes, and we agree, that the evidence was favorable to the defendant.

* * *

We now consider whether the suppressed information was material in a constitutional sense under *Brady*. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *United States v. Bagley,* [supra, 473 U.S. at 682, 105 S.Ct. 3375, 473 U.S.

667]; *State v. Shannon,* [212 Conn. 387, 399, 563 A.2d 646, cert. denied, 493 U.S. 980, 110 S.Ct. 510, 107 L.Ed.2d 512 (1989) ]; *State v. Pollitt,* 205 Conn. 132, 148-49, 531 A.2d 125 (1987)." (Internal quotation marks omitted.) *State v. Correa,* supra, 241 Conn. at 361, 696 A.2d 944. "[W]here there is no reasonable probability that disclosure of the exculpatory evidence would have affected the outcome, there is no constitutional violation under *Brady. State v. Gant,* 231 Conn. 43, 53, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S.Ct. 1404, 131 L.Ed.2d 291 (1995)." *State v. McIntyre,* supra, 242 Conn. at 324, 699 A.2d 911.

The purpose of requiring the state to disclose impeachment evidence to a criminal defendant is "to ensure that the jury knows the facts that might motivate a witness in giving testimony. . . ." (Internal quotation marks omitted.) *State v. Paradise,* 213 Conn. 388, 400, 567 A.2d 1221 (1990). In determining whether impeachment evidence is material, "the question is not whether the verdict might have been different without any of [the witness'] testimony, but whether the verdict might have been different if [the witness'] testimony [was] further impeached by disclosure of the [alleged] deal." (Internal quotation marks omitted.) *Id.*, at 401, 567 A.2d 1221. The fact that the witness' testimony is corroborated by additional evidence supporting a guilty verdict also may be considered in determining whether the suppressed impeachment evidence was material. See *Quintana v. Commissioner of Correction,* 55 Conn. App. 426, 439, 739 A.2d 701, cert. denied, 252 Conn. 904, 743 A.2d 614 (1999) ("[c]ourts have found that improperly withheld impeachment evidence is not material where the testimony of the witness who might have been impeached is strongly corroborated by additional evidence supporting a guilty verdict").

When Younger testified, defense counsel had information that Younger had a lengthy arrest record, that drug charges against him had been pending for approximately eighteen months, that he was not being held in prison and that, at the time of his arrest on the drug charges and at the time of his testimony, he was on probation for a 1988 robbery conviction. During cross-examination, Younger testified that he did not know whether his case had not been disposed of because the state was waiting for his testimony in this case. He also testified that, at the time of his arrest, he did not ask the police about making a deal in exchange for information about this case. He further testified that, although he had numerous prior convictions and pending drug charges against him, he was not being held in jail. He testified that, nevertheless, to his knowledge, the state had given him no consideration in exchange for his agreement to testify in this case. There is nothing in the record to suggest that Younger's testimony was false or intentionally misleading.

20

The jury reasonably could have inferred from Younger's testimony that, even though he did not have a specific deal with the state and did not know of any past consideration for his testimony, his pending charges provided a motivation for him to testify favorably for the state.  Indeed, in closing arguments, defense counsel urged the jury to make that very inference.  See footnote 20 of this opinion.  Furthermore, the trial court instructed the jury that it could consider whether Younger was expecting favorable treatment from the state in the case pending against him in deciding whether Younger had any bias, interest or motive to testify falsely.

We recognize that the suppressed evidence was not merely cumulative because it could have allowed the defendant to establish a stronger link between Younger's willingness to testify for the state and his expectation of favorable treatment from the state.   The test for the materiality of impeachment evidence, however, is whether further impeachment of the testimony might have resulted in a different verdict. *State v. Paradise,* supra, 213 Conn. at 401, 567 A.2d 1221.  Because the jury was apprised of Younger's motivation for testifying falsely for the state, the impeachment value of the suppressed evidence merely would have been incremental. Furthermore, Younger's testimony was corroborated by the other two eyewitnesses, lending additional credibility to his testimony.  See *Quintana v. Commissioner of Correction,* supra, 55 Conn. App. at 439, 739 A.2d 701.

We conclude that there is no reasonable probability that the jury would have reached a different verdict had the state disclosed the suppressed evidence. Therefore, the evidence was not material under *Brady*.  Accordingly, the defendant's *Brady* claim must fail.

This does not mean, however, that we condone the failure of the office of the state's attorney to disclose its lack of opposition to the reduction of Younger's bond to a promise to appear, its decision not to pursue the violation of probation against Younger and the letter from Teitell.  The failure to disclose that information is inexcusable and, were it not for the fact that the evidence was not material under *Brady*, the judgment would have been reversed.

(Footnotes omitted.)  *Floyd*, 253 Conn. at 724-48.

## 2.   Law applicable to the petitioner's *Brady* claims

The petitioner claims that "the State violated his Constitutional right by failing to disclose impeachment evidence pertaining to the testimony of two of the State's witnesses."  Petition [Doc. # 31] at 2.  He argues that such failure by the State violated the

principles established in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). As demonstrated, however, the Connecticut Supreme Court's application of *Brady* was reasonable. Thus, the petitioner is not entitled to habeas corpus relief.

The "Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles v. Whitley*, 514 U.S. 419, 436-37, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995). Rather, "'[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)." *Boyette v. Lefevre*, 246 F.3d 76, 89 (2d Cir. 2001).

To establish prejudice, the petitioner must show that the evidence was material. *Strickler*, 527 U.S. at 282, 119 S.Ct. at 1948. Evidence is considered to be "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. at 433, 115 S.Ct. at 1565; *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566; *Payne*, 63 F.3d at 1209. A *Brady* inquiry is not based on the sufficiency of the evidence. Rather, the question is whether the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290, 119 S.Ct. at 1952.

### 3.    The Connecticut Supreme Court reasonably determined that no *Brady* violation existed

The petitioner claims that the "state violated his constitutional right by failing to disclose impeachment evidence pertaining to the testimony of a state's witness."[3] Paragraph 17 of Petition. On appeal to the Connecticut Supreme Court, the state conceded that it had not disclosed "that it had not opposed Younger's request for a reduction of a $ 50,000 bond to a promise to appear. Nor did it disclose Teitell's letter." *Floyd*, 253 Conn. at 741. It also conceded that the information was favorable to the petitioner. *Id.* Rather, the respondent submits that the information was not material.

### a.    The withheld information is not material because Younger's testimony was corroborated by other evidence

In determining whether suppressed evidence is material, courts may consider the existence of corroborating evidence. For example, in *Strickler*, the High Court determined that withheld evidence was not material in a kidnapping/murder trial. The withheld information concerned prior statements of an eyewitness, Anne Stoltzfus, to the abduction. At trial, Stoltzfus testified that she had "an exceptionally good memory," that the defendant made an impression on her and she paid attention, and that she had "absolutely no doubt of [her] identification." *Strickler*, 527 U.S. at 272-73, 119 S.Ct. at 1944. The withheld information indicated that Stoltzfus told police that she "had a very vague memory" about

---

[3]    Both the state trial court and the Connecticut Supreme Court concluded that no implied plea agreement existed between Younger and the State. *Floyd*, 253 Conn. at 739 ("We conclude that the trial court reasonably could have found, based on the evidence presented, that there was no implied plea agreement between Younger and the state"). This finding of fact is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).

the relevant events, that she could not identify the victim or the men who abducted her, and that she later was able to identify the victim after spending several hours with the victim's boyfriend "looking at current photos." *Id.* at 273-75, 1944-45. The Court's decision that the information was not material rested on the introduction at trial of "considerable forensic and other physical evidence linking petitioner to the crime." *Id.* at 293, 1954. Additionally, two other witnesses partially corroborated the eyewitness by testifying that they saw the petitioner and his cohort at the scene of the kidnapping. It also noted that another witness observed the petitioner driving the car that the victim had been using near the scene of the murder. *Id.* Because of this and other evidence, the Court determined that "the record provides strong support for the conclusion" that the defendant "would have been convicted of capital murder and sentenced to death, even if Stoltzfus had been severely impeached." *Id.* at 294, 1954. Thus, the withheld information was not material and no *Brady* violation had occurred.

Likewise, in *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), the High Court confronted a situation regarding withheld impeachment evidence. At trial, a witness, Virgil Sanders, testified that two days after the killing of a bar operator in Lansing, Illinois the defendant told him that "it was 'open season on bartenders' and that he had shot one in Lansing." *Moore*, 408 U.S. at 789, 92 S.Ct. at 2565. Sanders testified that this conversation occurred in a bar in Dolton, Illinois. Sanders identified the man who spoke to him as "Slick." After the defendant was convicted, counsel learned that Sanders told police that he had previously met "Slick" at a bar in Chicago. Sanders, however, had been incarcerated in Kansas at the time that he claimed to have met "Slick" in Chicago.

24

Other withheld evidence contradicted Sander's identification of the defendant as "Slick." The Court determined, however, that this information was not material because two witnesses positively identified the defendant as the killer. *Id.* at 796-97, 2569. Another two witnesses placed the defendant at the bar in Dalton two days after the murder. *Id.* One of these witnesses gave the defendant and his companion a ride from the bar in Dalton to Harvey, Illinois during which one of them stated, "Well, if we hadn't had that trouble with the bartender in Lansing, we'd have been all right." *Id.* at 789, 2565. Thus, the High Court held that the withheld information was not material and that no *Brady* violation had occurred.

In the instant case, the Connecticut Supreme Court found that "Younger's testimony was corroborated by the other two eyewitnesses." *Floyd*, 253 Conn. at 746. Specifically, Alex Delgado testified that "as he and the victim walked up Clinton Avenue, the [petitioner], who held a gun, approached them and asked what they were doing there." *Floyd*, 253 Conn. at 727-29 n.19. As Delgado was talking to the petitioner, he was aware of other people near him and he was struck on the head and knocked to the ground. Appendix F at 151. Delgado reported that "while he was on the ground, the [petitioner] yelled for Mickey and, at that point, two men farther up the street started coming toward the [petitioner] and Delgado." *Floyd*, 253 Conn. at 727-29 n.19. After the petitioner "had taken his money and jewelry, [Delgado] ran down Clinton Avenue toward Railroad Avenue." *Id.* Delgado testified that the petitioner "fired three or four gunshots at him as he ran." *Id.*

25

The statement of another witness, Reginald Barry, was admitted at trial.[4]  In that statement, Barry reported that "he was in a driveway at 65 Clinton Avenue when he saw 'two guys with masks' approaching him.  Barry did not identify the two men as Delgado and the victim, but, later in his statement, referred to the victim as 'the schoolteacher.'  Believing that the men were going to rob him, Barry 'yelled for Fugi.'"  *Floyd*, 253 Conn. at 727-29 n.19.  "[A]fter he yelled for Fugi, the [petitioner] 'came out of [a] house with a big gun,' approached Delgado and the victim as they walked down Clinton Avenue, and asked them what they were doing there."  *Id.*  According to Barry, the petitioner then "told Delgado and the victim to 'get on the ground'" and that Barry then "saw Mickey and several others get out of a car and approach the [petitioner], Delgado, and the victim just before shooting him."  *Id.*  "Barry's statement indicated that, after the defendant began to pistol whip the two men, one of the men ran."  *Id.*  The petitioner "fired a gunshot at the man who ran" and then "fired approximately five gunshots at the victim as he lay on the ground."  *Id.*

The victim sustained blunt trauma injuries to the head and bridge of the nose prior to his death.  Appendix G at 8-12.  The autopsy also "revealed three gunshot wounds, one of which caused the victim's death and another of which potentially was fatal."  *Floyd*, 253 Conn. at 704.

---

[4]    Barry's statement was admitted under an evidentiary rule created by the Connecticut Supreme Court in *State v. Whelan,* 200 Conn. 743, 513 A.2d 86, *cert. denied,* 479 U.S. 994, 107 S.Ct. 597 (1986).  *Whelan* allows "the substantive use of prior written inconsistent statements" if the statements are "signed by the declarant, who has personal knowledge of the facts stated" and "the declarant testifies at trial and is subject to cross examination." *Id.* at 753.

> **b.    The withheld information is not material because Younger was substantially impeached by similar evidence**

"[S]uppressed impeachment evidence is not material where the new evidence merely constitutes 'an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'" *United States v. Diaz,* 176 F.3d 52, 108 (2d Cir. 1999), *quoting Payne*, 63 F.3d at 1210; *United States v. Amiel,* 95 F.3d 135, 145 (2d Cir. 1996).  Likewise, when a witness's credibility has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim. . . ." (Citations omitted.)  *Tankleff v. Senkowski,* 135 F.3d 235, 251 (2d Cir. 1998), *cert. denied,* 531 U.S. 1051, 121 S.Ct. 654, 148 L.Ed.2d 558 (2000).

In the instant case, the jury learned that Younger had four or five prior convictions, including convictions for assault, robbery, burglary and drugs.  *Floyd*, 253 Conn. at 726; Appendix G at 152.  It was aware that Younger was a drug dealer.  Appendix G at 131, 135, 152.  The jury also heard that Younger had witnessed the shooting on January 21, 1994 but that he did not come forward with that information.  *Floyd*, 253 Conn. at 726. Instead, he left for North Carolina the following day.  *Id.*  The jury was aware that it was not until June 1994, after Younger had been arrested on charges of possession of narcotics with intent to sell, that he told police that he had witnessed the shooting and provided them with a written statement.  *Id.*  Additionally:

> When Younger testified, defense counsel had information that Younger had a lengthy arrest record, that drug charges against him had been pending for approximately eighteen months, that he was not being held in prison and that, at the time of his arrest on the drug charges and at the time of his

testimony, he was on probation for a 1988 robbery conviction. During cross-examination, Younger testified that he did not know whether his case had not been disposed of because the state was waiting for his testimony in this case. He also testified that, at the time of his arrest, he did not ask the police about making a deal in exchange for information about this case. He further testified that, although he had numerous prior convictions and pending drug charges against him, he was not being held in jail.

*Id.* at 745; Appendix G at 132, 155-57.

Thus, the jury was presented with evidence from which it could infer that Younger's "pending charges provided a motivation for him to testify favorably for the state." *Floyd*, 253 Conn. at 745. Indeed, during closing arguments, defense counsel urged the jury to make that inference, as follows:

It seems that [all of the state's witnesses] get to talk to the police when they get arrested themselves, and they all are getting arrested for serious crimes. One of them has charges pending for a year and [one-half and] has an extensive record. I believe he testified he had five or six prior convictions, and of those prior five or six convictions, none of his cases lasted more than a year. Now, all of a sudden, he's not expecting any kind of special treatment here, but if he does what the state wants, his case is still pending out there, and we don't know what's going to happen to that case. Does he have an interest in this case? Does he have an interest in telling the story that the state would like him to tell with regard to this incident?

*Floyd*, 253 Conn. at 729 n.20.

The trial court even instructed the jury that "it could consider whether Younger was expecting favorable treatment from the state in the case pending against him in deciding whether Younger had any bias, interest or motive to testify falsely." *Floyd*, 253 Conn. at 745-46. Specifically, the trial court instructed the jury that:

There has also been testimony here, I believe it was as to the witness, Mr. Younger, that he had--or has a pending charge at the present moment. That evidence is offered solely for you to determine to what extent, if any, the pending charge in this court or any other court, filed against the witness, may provide a motive for him to testify falsely.

> The evidence is not offered to attack the credibility of the witness, because there has obviously been no conviction as to that particular charge. Rather, such evidence may be used by you to decide whether the witness has any bias, interest, or motive to testify falsely. That is, is he expecting some favorable consideration in that case to testify falsely here. You may accord those charges and any motive, interest, or bias you find the witness had, such weight, if any, you feel is appropriate.

Appendix F at 376.

Moreover, "Younger gave his written statement concerning the killing to the police before he received any favorable treatment from the state." *Floyd*, 253 Conn. at 746 n.33. If the impeachment information had been disclosed and Younger had been cross-examined about it, Younger's statement could have been admitted as a prior consistent statement in order to rehabilitate Younger. *State v. Dolphin,* 178 Conn. 564, 568-71, 424 A.2d 266 (1979) (admission of prior consistent statement is proper to rehabilitate a witness "after impeachment on the basis of bias, motive, or interest" if the "statement was made before the time at which the motive, interest, or bias arose"); *State v. Reddick,* 15 Conn. App. 342, 348-49, 545 A.2d 1109 (1988) (after the defense suggested on cross-examination that the witness' trial testimony was the product of an agreement with the state regarding charges pending against him, the witness' statement to police was properly admitted as a prior consistent statement). From this statement, "the jury reasonably could have inferred that favorable treatment by the state was not the primary reason why Younger provided the state with the information implicating" the petitioner in the crime. *Floyd*, 253 Conn. at 746 n.33.

In summary, the suppressed evidence consisted of the fact that the state "had not opposed Younger's request for a reduction of a $ 50,000 bond to a promise to appear. Nor did it disclose Teitell's letter." *Floyd*, 253 Conn. at 741. Given the circumstances as

explained above, the Connecticut Supreme Court found "the jury was apprised of Younger's motivation for testifying falsely for the state" and, therefore, that "the impeachment value of the suppressed evidence merely would have been incremental." *Floyd*, 253 Conn. at 746. Such determination is neither contrary to, nor an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Thus, the petitioner's claim must fail.

### D.    The Connecticut Appellate Court Reasonably Determined That No *Brady* Violation Existed

The petitioner also claims that the state violated the mandates of *Brady v. Maryland* when it "failed to turn over the second page of Detective Sherbo's police report" which contained information that "Alex Delgado informed a member of the victim's family that two other individuals were responsible for the murder, but two months later turned around and accused the defendant." Petition [Doc. # 31] at 6. He also complains about the timing of the disclosure of statements given by Luis Troncoso and Michael Younger. Contrary his assertions, however, the state courts determined that the petitioner was provided with the information and that the timing of such disclosure was not prejudicial. Absent clear and convincing evidence to the contrary, the petitioner cannot overcome the presumption of correctness that attaches to this factual finding. As a result, the petitioner cannot prevail on this claim.

### 1.    The Connecticut Appellate Court's resolution of the claim

On appeal from the decision of the state habeas court, the Connecticut Appellate Court resolved the petitioner's claim, as follows:

30

The petitioner next argues that the court improperly dismissed his claim that the state suppressed exculpatory information in violation of his right to due process of law under *Brady v. Maryland*, supra, 373 U.S. at 87, 83 S.Ct. 1194. Specifically, he claims that the state's failure to disclose the second page of a report prepared by Sergeant Joseph Sherbo of the Bridgeport police department and its late disclosure of the sworn statements of Troncoso and Younger, when taken cumulatively, prevented Tymniak from adequately investigating and developing a third party culpability defense. We are not persuaded.

"In *[Brady v. Maryland,* supra, 373 U.S. at 83, 83 S.Ct. 1194] . . . the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, the [petitioner] must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the [petitioner], and (3) it was material [either to guilt or to punishment]. . . .

"It is well established that [e]vidence known to the [petitioner] or his counsel, or that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*. . . . Furthermore, we have stated: *Brady* does not mandate pretrial disclosure in all cases. . . . Where there has been an initial disclosure of exculpatory evidence at trial, the appropriate standard to be applied is whether the disclosure came so late as to prevent the [petitioner] from receiving a fair trial. . . . The [petitioner] bears the burden of proving that he was prejudiced by the failure of the state to make the disclosure earlier." (Citations omitted; internal quotation marks omitted.) *State v. Thompson,* 81 Conn. App. 264, 277-78, 839 A.2d 622, cert. denied, 268 Conn. 915, 847 A.2d 312 (2004).

Whether the evidence was disclosed in sufficient time for the petitioner to have used it effectively at trial was a factual determination for the habeas court. See *State v. Stinson,* 33 Conn. App. 116, 120, 633 A.2d 728 (1993).

In the present case, the court determined that the petitioner did not meet his burden with regard to any of the three statements. "[T]he court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous." (Internal quotation marks omitted.) *Walker v. Commissioner of Correction,* 73 Conn.App. 629, 632, 809 A.2d 521 (2002), cert. denied, 262 Conn. 943, 815 A.2d 677 (2003). "A

31

finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State v. Warren,* 77 Conn.App. 564, 568, 824 A.2d 849, cert. denied, 265 Conn. 907, 831 A.2d 253 (2003). "The habeas court judge, as trier of the facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.) *Edwards v. Commissioner of Correction,* 88 Conn.App. 169, 173, 868 A.2d 125, cert. denied, 273 Conn. 941, 875 A.2d 43 (2005). We examine each of the court's findings in turn.

At the habeas proceeding, the petitioner claimed that the second page of Sherbo's report, petitioner's exhibit eleven, was suppressed.[5] The court found that the report in its entirety "was not suppressed and was made available to the defense at an appropriate time and, therefore, was not a *Brady* violation." The court stated that it reached this factual determination after hearing testimony from Sherbo and the trial prosecutor, senior assistant state's attorney C. Robert Satti, Jr., that all eight pages of the report, identified by both witnesses as respondent's exhibit B, were made available to Tymniak during the trial in 1995. The court credited the testimony of Sherbo and Satti after examining the transcript of Tymniak's cross-examination of Sherbo regarding his report during the trial and comparing the petitioner's exhibit eleven with the respondent's exhibit B.

Moreover, the court determined that "the report contains double and triple hearsay, and there is nothing in that page that proves that attorney Tymniak could have found out any information as to third party culpability if he had investigated the comments made in petitioner's exhibit eleven. It is pure speculation to believe that Delgado would have stated this information in court or that . . . Davila would have given up any information. They might well have exercised their fifth amendment rights. Certainly, if Joel or Mickey

---

[5]    "The second page of the Sherbo report contains the following: "Also interviewed was Auggie Avellanet brother of the victim. He told the undersigned that Jesus told him that Delgado said that Joel and Mickey did the shooting, Auggie also believes that Jesus knows more [than] what he is telling. . . ." Specifically, the petitioner contends that the page was omitted from the hearing in probable cause discovery package and that he did not receive it until two years after the appeal pursuant to a freedom of information request from the Bridgeport police department." *Floyd II*, 99 Conn. App. at 535 n.3.

could have been identified, they would hardly have admitted to the shooting. It should also be noted that there was no evidence regarding the availability of these witnesses. . . . [I]t is speculation as to what benefit [the page] would have been to the petitioner at his criminal trial." On the basis of our review of the record, the court's memorandum of decision and the exhibits, we are not left with the definite and firm conviction that a mistake has been committed. The court's finding regarding the second page of the Sherbo report is not clearly erroneous.

With respect to Troncoso's statement, the court found that it "clearly" had not been suppressed because the state disclosed a summary of the statement on May 24, 1994, before the hearing in probable cause, and disclosed the actual statement nearly three weeks prior to trial. The petitioner asserts that the court's conclusion was improper because the actual statement included additional information that was not contained in the summary report. Specifically, Troncoso stated that "Jimmy" and "Jeff," the two individuals mentioned in the summary of the statement, were members of a gang and that Jimmy "hangs out at 42 Clinton Street."

The court's finding that the state had not suppressed the Troncoso information is not clearly erroneous. The state disclosed the information to Tymniak prior to trial. He chose not to seek a continuance to investigate further the man purported to have been living in the yellow house or the "Jimmy" or "Jeff" mentioned by Troncoso in the statement. The petitioner failed to present any evidence that Troncoso or any of the witnesses referred to in the statement were available to testify at the original trial. See *Ostolaza v. Warden,* supra, 26 Conn. App. at 766, 603 A.2d 768. Moreover, the habeas court heard testimony from Satti that the information given by Troncoso may not have concerned the homicide of the victim in this case, but other homicides on the same street that occurred at about the same time.

We last address the Younger statement. The court found that the state had disclosed the police report containing the statement to the petitioner's counsel at the time of trial following Younger's testimony in accordance with the rule of practice then in effect. The petitioner claims that the state should have disclosed the statement earlier because [Younger's] description of the shooting was "strikingly different" from the testimony given by the other two eyewitnesses to the crime, Delgado and Berry, and, therefore, constituted exculpatory impeachment evidence.

On the basis of our review of the record, we conclude that the versions of the shooting from all three witnesses are essentially consistent, the only significant difference being that Berry recanted his statement at trial and that it was admitted under *State v. Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 598 (1986). Accordingly, the court's finding that the petitioner failed to prove that he was prejudiced by the timing of the state's disclosure of Younger's statement is not clearly erroneous.

(Footnotes omitted.)  *Floyd II,* 99 Conn. App. at 533-38.

### 2.    The state courts determined that the entire Sherbo report was disclosed

The petitioner alleges that "the State failed to turn over the second page of Detective Sherbo's police report." Petition [Doc. # 31] at 6.  Contrary to this assertion, the state habeas court determined that the defense was given Sherbo's entire report.  The state habeas court "reached this factual determination after hearing testimony from Sherbo and the trial prosecutor, senior assistant state's attorney C. Robert Satti, Jr., that all eight pages of the report, identified by both witnesses as respondent's exhibit B, were made available to Tymniak during the trial in 1995." *Floyd II*, 99 Conn. App. at 535.  The state habeas court noted that such testimony was corroborated by "the transcript of Tymniak's cross-examination of Sherbo regarding his report during the trial. . . ."  The court came to this conclusion after comparing the report to the transcript.

"[A] state court's determination of a factual issue is presumed to be correct , and is unreasonable only where the petitioner meets the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'  28 U.S.C. § 2254(e)(1); *see also Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir. 2003); *Mask v. McGinnis*, 233 F.3d 132, 139 (2d Cir. 2000).  Moreover, a state court's finding of fact 'will not be overturned on factual grounds

34

unless objectively unreasonable in light of the evidence presented in the state court proceeding.' *Miller-El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)." *Lynn v. Bliden,* 443 F.3d 238, 246-47 (2d Cir. 2006).

Given the state habeas court's findings, the petitioner cannot prevail on his *Brady* claim.  The state habeas court did not merely find that the petitioner was unable to prove that a page of the report was suppressed; it affirmatively found that the petitioner possessed all eight pages of the report.   Such findings were based on the testimony of two witnesses and a comparison of the report to the cross-examination of Sherbo, the author's report.  Given these findings, the decision of the state courts that no *Brady* violation existed is not unreasonable and federal habeas relief is unwarranted.

### 3.    The state courts determined that the statement of Luis Troncoso was disclosed in a timely manner

As part of his claim, the petitioner complains that the disclosure of the sworn statement of Luis Troncoso was untimely.  Petition [Doc. # 31] at 7.  Such allegation, however, is contradicted by the state habeas court's determination that "[w]ith respect to Troncoso's statement . . . it 'clearly' had not been suppressed because the state disclosed a summary of the statement on May 24, 1994, before the hearing in probable cause, and disclosed the actual statement nearly three weeks prior to trial."[6]  *Floyd II,* 99 Conn. App. at 536.  Given these findings, the petitioner cannot prevail on his claim.

---

[6]    The state habeas court found  that Troncoso's statement was "provided by supplemental disclosure dated November 8, 1995 . . . which was prior to the trial which commenced on November 28, 1995."  Appendix J at 27-28.  The state began presenting evidence on December 4, 1995.  Appendix F at 69.

"[A] state court's determination of a factual issue is presumed to be correct , and is unreasonable only where the petitioner meets the burden of 'rebutting the presumption of correctness by clear and convincing evidence.' 28 U.S.C. § 2254(e)(1); *see also Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir. 2003); *Mask v. McGinnis*, 233 F.3d 132, 139 (2d Cir. 2000). Moreover, a state court's finding of fact 'will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.' *Miller-El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)." *Lynn v. Bliden,* 443 F.3d 238, 246-47 (2d Cir. 2006).

Even absent such factual findings, the petitioner cannot prevail. The Supreme Court of the United States has never addressed the timing of *Brady* disclosures. *But see United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (the "rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, arguably applies in three quite different situations. Each involves the discovery, *after trial* of information which had been known to the prosecution but unknown to the defense." [Emphasis added.]). In other words, no "clearly established" federal law, as determined by the Supreme Court of the United States, dictates *when* the state must disclose *Brady* material. Indeed, in *United States v. McPartlin,* 595 F.2d 1321, 1346 (7th Cir. 1979), the court explained that "[t]here is nothing in *Brady* or *Agurs* to require that . . . disclosures be made before trial. . . Thus, even though evidence might be material or might create a reasonable doubt as to guilt, Due Process, albeit requiring eventual disclosure, does not require that in all instances this disclosure must occur before trial." The Sixth Circuit has held that "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only

to a complete failure to disclose. . . ." (Citation omitted; quotation marks omitted.) *United States v. Davis,* 306 F.3d 398, 421 (6th Cir. 2002). The Eighth Circuit has determined that "[w]here the prosecution delays disclosure of evidence, but the evidence is nonetheless disclosed during trial, *Brady* is not violated. . . ." (Citations omitted.) *United States v. Gonzales,* 90 F.3d 1363, 1368-69 (8th Cir. 1996). The Second Circuit has expressly declined to describe the timing requirements of *Brady* because "[i]t is not feasible or desirable to specify the extent or timing of disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made.' . . ." (Citation omitted.) *DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006). If confronted with the issue, the Supreme Court may very well determine that disclosures must be made at a certain point in time. Under AEDPA, however, the issue is not how the Supreme Court would resolve a particular issue. Rather, AEDPA permits relief only if a state court decision is contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court.

Although the Supreme Court has never addressed the timing of *Brady* disclosures, some lower courts have done so. Those courts, however, do not always agree on the standard to be used in reviewing such claims. Indeed, the Sixth Circuit has explained that "[s]ome circuits have phrased the delayed-disclosure tests in terms of the defendant's ability to prepare for trial. . . . This court has not, however, endorsed such a formulation. Rather, we have expressly recognized the Supreme Court's explicit rejection of the argument that 'the [materiality] standard should focus on the impact of the undisclosed

37

evidence on the defendant's ability to prepare for trial,' *United States v. Agurs,* 427 U.S. 97, 112 n.20, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). . . ." (Citation omitted.) *Joseph v. Coyle,* 469 F.3d 441, 473 n.23 (6th Cir. 2006).

The First Circuit has determined that "[w]hen dealing with cases of delayed disclosure, 'the critical inquiry is . . . whether the tardiness prevented defense counsel from employing the material to good effect.' . . . In this connection, 'a court's principal concern must be whether learning the information altered the subsequent defense strategy, and whether, given timeous disclosure, a more effective strategy would likely have resulted.'. . ." (Citations omitted.) *United States v. Osorio*, 929 F.2d 753, 757 (1st Cir. 1991). To prevail on this claim, "the defendant must at a minimum make a *prima facie* showing of a plausible strategic option which the delay foreclosed.' . . ." (Citations omitted.) *United States v. Misla-Aldarondo*, 478 F.3d 52, 63 (1st Cir. 2007); *United States v. Bender*, 304 F.3d 161, 165 (1st Cir. 2002). The Second Circuit requires that disclosures be made at a time when the defense has the opportunity to use the evidence. The "opportunity to use" standard requires that the disclosure to be made at a time when there exists "the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought. . . ." *DiSimone*, 461 F.3d at 197. The U. S. Court of Appeals for the Fifth Circuit had articulated the standard to be whether the disclosure of information was so delayed that the defendants were unable to use [it] effectively at trial and the court's ability to reach a just result was impaired." *United States v. O'Keefe,* 128 F.3d 885, 898 (5th Cir. 1997). The Sixth Circuit has held that "[d]elay violates *Brady* only where the delay causes prejudice." (Citation omitted; quotation marks omitted.) *Davis,* 306 F.3d at 421. The Ninth

Circuit requires that the disclosure of *Brady* material "'must be made at a time when disclosure would be of value to the accused.' . . ." (Citations omitted.) *United States v. Gordon,* 844 F.2d 1397, 1403 (9th Cir. 1988). In the Tenth Circuit, a defendant can prevail on a claim that the disclosure of *Brady* material was delayed if he can demonstrate a "reasonable probability that the outcome of [the trial] would have been different had the State disclosed this information earlier. . . ." (Citation omitted.) *Knighton v. Mullin*, 293 F.3d 1165, 1172-73 (10th Cir. 2002). The Eleventh Circuit requires defendants to demonstrate prejudice–*e.g.,* the material came so late that it could not be used effectively." *United States v. Beale*, 921 F.2d 1412, 1426 (11th Cir. 1991).

In assessing a claim that a disclosure was untimely made, at least one circuit court places great weight on whether defense counsel moved for a continuance upon receiving the previously undisclosed information. In *Osorio*, the First Circuit explained that it is "incumbent upon a party faced with" a delayed disclosure "to ask explicitly that the court grant the time needed to regroup, or waive the point. . . . [A defendant's] claim that he was unfairly surprised is severely undermined, if not entirely undone, by his neglect to ask the district court for a continuance to meet the claimed exigency.' . . ." (Citations omitted.) *Osorio*, 929 F.2d at 758. *See also United States v. Smith,* 292 F.3d 90, 102 (1st Cir. 2002).

In Connecticut, the resolution of a claim that a disclosure was untimely depends on "'whether the disclosure came so late as to prevent the [petitioner] from receiving a fair trial. . . . The [petitioner] bears the burden of proving that he was prejudiced by the failure of the state to make the disclosure earlier.' (Citations omitted; internal quotation marks omitted.) *State v. Thompson,* 81 Conn. App. 264, 277-78, 839 A.2d 622, cert. denied,

268 Conn. 915, 847 A.2d 312 (2004)." *Floyd II,* 99 Conn. App. at 534. Here, the state courts determined that the timing did not prejudice the petitioner. In so doing, the court noted that the "state disclosed the information to Tymniak prior to trial. He chose not to seek a continuance to investigate further the man purported to have been living in the yellow house or the 'Jimmy' or 'Jeff' mentioned by Troncoso in the statement." *Floyd II,* 99 Conn. App. at 536-37. Moreover, a comparison of the summary–which was disclosed months before the trial–and the statement reveals that all pertinent information was disclosed. See Appendix K at A25, A56-A57. In his brief to the Connecticut Appellate Court, the petitioner asserted that "the statement included important additional information that was not part of the summary police report. . . ." Appendix K at 23. The only "additional information" that he specified, however, was that the two individuals mentioned in the summary, "Jimmy" and "Jeff," were both members of the Latin Kings gang and that "Jimmy" hangs out at 42 Clinton Street. Appendix K at 23-24. In its decision, the Appellate Court noted that "the habeas court heard testimony from [the prosecutor] that the information given by Troncoso may not have concerned the homicide of the victim in this case, but other homicides on the same street that occurred at about the same time." *Floyd II,* 99 Conn. App. at 537. Given that federal courts cannot agree on the standard to be used in analyzing such a claim, there is little merit to an argument that Connecticut's approach is unreasonable. For these reasons, the petitioner's claim must fail.

### 4. The state courts determined that the statement of Michael Younger was disclosed in a timely manner

Next, the petitioner complains that the disclosure of the sworn statement of Michael Younger was untimely. Petition [Doc. # 31] at 7. This allegation was rejected by the state

courts because the petitioner failed to demonstrate prejudice. That determination was not an unreasonable application of clearly established federal law as determined by the Supreme Court.

The petitioner's trial began on December 1, 1995 and concluded on December 8, 1995. When the sworn statement of Michael Younger was disclosed, the petitioner did not seek a continuance in order to investigate the information contained in that statement. Later, on direct appeal, he did not challenge the timing of the state's disclosure of Younger's statement. Rather, the issue was first raised during the petitioner's state habeas proceedings. The trial on the merits of his claims was held over several days between January and September 2004. Thus, the petitioner had approximately *8½ to 9 years* to investigate the information contained in Michael Younger's statement. Nevertheless, at the state habeas trial, he presented no evidence showing how an earlier disclosure would have helped his defense. Thus, the Connecticut Appellate Court's determination that "the petitioner failed to prove that he was prejudiced by the timing of the state's disclosure of Younger's statement is not clearly erroneous" is not unreasonable.

Given that (1) the Supreme Court has never addressed the timing requirements of *Brady* disclosures; (2) the statement was given to the defense and, therefore, was not suppressed; and (3) defense counsel did not object to the timing of the disclosure and did not seek a continuance; the state courts determination cannot be considered an unreasonable application of *Brady v. Maryland*. For these reasons, the petitioner's claim must fail.

**E.    The Connecticut Appellate Court Reasonably Determined That
The Petitioner's False Testimony Claim Was Meritless**

Next, the petitioner asserts that the state knowingly used perjured testimony during

his trial.  This claim is based on his allegation that Michael Younger lied "when he denied

receiving consideration from the State or the Police for his testimony."  Petition [Doc. # 31]

at 8.  He also alleges that the prosecutor "impermissibly vouched for the witness testimony

by lying to the jury when he said that there is no evidence to refute that Younger was given

consideration when in fact there was , buy the State suppressed it."  Petition [Doc. # 31]

at 8.  As previously demonstrated, however, the Connecticut Supreme Court determined

that "no implied plea agreement" existed between Younger and the state.  Thus, because

no factual basis exists to support his assertions, the petitioner's claim must fail.

**1.    The Connecticut Appellate Court's decision**

On appeal from the decision of the state habeas court, the Connecticut Appellate

Court rejected the petitioner's claim, as follows:

> Finally, we consider the petitioner's claim that the state knowingly used false
> testimony to obtain his conviction.  Specifically, the petitioner argues that the
> state knowingly withheld from him and the jury information that Younger had
> been granted favorable consideration from the state in exchange for his
> testimony.  In support of his claim, the petitioner asserts that the state
> improperly vouched for Younger's credibility in its closing argument,
> effectively bolstering Younger's testimony that he had not received favorable
> consideration in exchange for his testimony.[7]  We disagree in light of our

---

[7]    "The state maintains that the issue of whether the state knowingly used perjured
testimony to obtain the conviction is not reviewable on appeal because the petitioner did
not allege it in his amended petition or in his posttrial brief.  We review this claim, however,
as the petitioner bases his argument on the state's vouching for Younger's credibility during
closing argument, a ground that was both alleged in the amended petition and addressed
by the habeas court in the memorandum of decision, albeit in the context of the discussion
of the petitioner's *Brady* claims."  *Floyd II*, 99 Conn. App. at 538 n.8.

42

Supreme Court's previous resolution of the consideration issue on direct appeal; see *State v. Floyd,* supra, 253 Conn. at 739-40, 756 A.2d 799.

In its memorandum of decision, the habeas court stated that "Michael Younger . . . had criminal charges pending [against him] in the judicial district of Fairfield at the time that he testified against the petitioner at the petitioner's criminal trial.   The petitioner had requested an evidentiary hearing to determine whether a plea agreement between the state and Younger has been disclosed to the trial court and to defense counsel before Younger had testified. . . .   [Our] Supreme Court ordered the trial court to hold an evidentiary hearing to determine whether Younger and the state had a plea agreement when Younger testified at trial.  [The trial court, *Gormley, J.*] conducted such a hearing and held that there was not an undisclosed, implied agreement between Younger and the state.  [Our] Supreme Court stated in *State v. Floyd,* [supra, 253 Conn. at 739-40, 756 A.2d 799] in pertinent part as follows:  'We conclude that the trial court reasonably could have found, based on the evidence presented, that there was no implied plea agreement between Younger and the state. . . .   Accordingly, we conclude that the trial court's factual finding that there was no such implied agreement must stand.' "  Quoting further from the Supreme Court decision in *State v. Floyd,* supra, at 745-46, 756 A.2d 799, the trial court stated: " '[T]he jury reasonably could have inferred from Younger's testimony that, even though he did not have a specific deal with the state and did not know of any past consideration for his testimony, his pending charges provided a motivation for him to testify favorably for the state.  Indeed, in closing arguments, defense counsel urged the jury to make that very inference. . . .  Furthermore, the trial court instructed the jury that it could consider whether Younger was expecting favorable treatment from the state in the case pending against him in deciding whether Younger had any bias, interest or motive to testify falsely.' "

We agree with the petitioner who, quoting *State v. Goodson,* 84 Conn. App. 786, 803, 856 A.2d 1012, cert. denied, 271 Conn. 941, 861 A.2d 515 (2004), stated that " '[t]he knowing presentation of false evidence by the state is incompatible with the rudimentary demands of justice. . . .   A new trial is required if the false testimony could ... in any reasonable likelihood have affected the judgment of the jury.' "  Our Supreme Court, however, affirmed the factual finding that there was no plea agreement between Younger and the state.   The prosecutor's remarks in closing argument therefore were not based on false testimony, as the petitioner claims.   Consequently, the petitioner's claim must fail.

(Footnotes omitted.)  *Floyd II,* 99 Conn. App. at 538-40.

> ## 2. The state courts' finding that no plea agreement existed is entitled to a presumption of correctness

The petitioner asserts that Younger falsely denied "receiving consideration from the State or the Police for his testimony."  Petition [Doc. # 31] at 8.  The relevant portion of the cross-examination of Younger contains the following testimony.

Q.    Do you currently have a charge pending against you?

A.    Yes.

* * *

Q.    It has not been taken care of?

A.    No.

Q.    Is the reason it hasn't been taken care of is because you're waiting for until the outcome of what happens in this case?

A.    I don't know.

* * *

Q.    Have they made you an offer?

A.    No.

* * *

Q.    Who brought up the shooting of January of 1994?  Was it the police or was it you?

A.    Me.

Q.    And when you brought that topic up did you ask them whether you might be able to cut a deal if you gave them information?

A.    No.

44

Q.    You're sure.

A.    Pretty much sure, yeah.

Q.    But there might be a doubt in your mind; isn't that true?

A.    No.  There's no doubt.  I know the police can't made deals for you in court.

* * *

Q.    And it's your testimony that there's been no consideration given to you to help the state try and get a conviction against Mr. Floyd.

A.    Not to my knowledge.

Appendix G at 155-58; Appendix C at A13-A16.

The U.S. Supreme Court has held that "a conviction must be set aside if (1) 'the prosecution knew, or should have known, of the perjury,' and (2) 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'  *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)."  *Drake v. Portuondo,* 321 F.3d 338, 345 (2d Cir. 2003).

Here, the petitioner cannot establish that Younger's testimony was false.  Indeed, the Connecticut Supreme Court concluded that "[t]here is nothing in the record to suggest that Younger's testimony was false or intentionally misleading."  *Floyd I,* 253 Conn. at 745.  That finding was supported by a subordinate finding "that there was no implied plea agreement between Younger and the state. . . .  Accordingly, we conclude that the trial court's factual finding that there was no such implied agreement must stand."  *Floyd I,* 253 Conn. at 740. These findings were based, in part, upon the following evidence:

45

> [Younger's attorney, Catherine E. Teitell,] testified that she had no knowledge of any specific plea agreement, but, rather, that she hoped that Younger's testimony would lead to such an agreement.   [State's Attorney Donald A. Browne] testified that he had no specific recollection of Younger's case.    He also testified, however, that, although it was his practice to indicate to the attorney for a cooperating witness that the cooperation would be brought to the attention of the sentencing court, he generally does not enter into specific plea agreements in such cases.   He testified that one reason for this policy is that "there are too many unknowns" for the state to commit itself to a plea agreement on the sole basis that the defendant has agreed to testify in another case.

*Floyd I,* 253 Conn. at 739-40.

The relevant language of § 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." This "statutory presumption refers to historical facts, that is, recitals of external events and *the credibility of the witnesses* narrating them." (Citation omitted; emphasis added.)  *Smith v. Mann*, 173 F.3d 73, 76 (2d Cir. 1999); *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997); *Green v. Scully*, 850 F.2d 894, 900 (2d Cir. 1988).  This presumption is "particularly important when reviewing the trial court's assessment of witness credibility. . . ."  (Citation omitted.)  *Cotto v. Herbert*, 331 F.3d 217, 233 (2d Cir. 2003).

Here, the Connecticut Supreme Court reviewed the evidence and concluded that the trial court's findings were supported by the evidence.  Its factual determinations must be presumed correct and the petitioner has failed to rebut those findings by clear and convincing evidence.  As a result, the petitioner cannot prevail on his claim.

**F.    The Connecticut Supreme Court Reasonably Determined That The Prosecutor's Statements During Rebuttal Argument Did Not Deprive The Petitioner Of A Fair Trial**

As his fifth claim, the petitioner asserts that "the state's attorney made a missing witness argument during closing argument."  Petition [Doc. # 31] at 2.  This claim pertains to a state procedural rule under which counsel may not ask the jury to draw an unfavorable inference from a witness' absence without first obtaining permission from the trial court. For the reasons set forth below, the petitioner is not entitled to federal habeas corpus relief and his petition for writ of habeas corpus must be dismissed.

**1.    Decision of the Connecticut Supreme Court**

On direct appeal, the petitioner claimed that the prosecutor gave a "missing witness" argument without first obtaining the trial court's approval.  See *State v. Daniels,* 180 Conn. 101, 113, 429 A.2d 813 (1980) (if counsel intends to argue that "an unfavorable inference be drawn from the absence of a witness . . . an advance ruling from the trial court should be sought and obtained").[8]  In rejecting the petitioner's claim, the Connecticut Supreme Court made the following findings:

> The defendant's final claim is that, during closing arguments, the state's attorney improperly made a missing witness argument.  Specifically, the defendant complains of the following statements:  "[W]here is the evidence of [a plea agreement, defense counsel] . . . ?  Call [Younger's] lawyer up. Have the lawyer come down and testify."  The defendant claims that these remarks improperly suggested to the jury that the defendant would ordinarily call the witness' defense attorney as a witness, but that he was reluctant to do so in this case because he was afraid of what the attorney would have said.  The defendant did not object to these remarks at trial.

_____

[8]    The petitioner also claimed that the prosecutor stated, "I don't expect [Younger would] get any consideration from the state."  Appendix C at 39-40.  A corrected transcript revealed that the prosecutor, who was paraphrasing Younger's testimony, actually stated, 'I don't expect to get any consideration from the state.'"  *Floyd*, 253 Conn. at 748 n.35.

"We have previously acknowledged that prosecutorial misconduct can occur in the course of closing argument. . . .  It is well settled, however, that a defendant may not prevail under *Golding*[9] or the plain error doctrine unless the prosecutorial impropriety was so pervasive or egregious as to constitute an infringement of the defendant's right to a fair trial, nor will we invoke our supervisory authority to reverse an otherwise lawful criminal conviction absent a showing that the conduct of the prosecutor was so offensive to the judicial process that a new trial is necessary to deter such misconduct in the future. . . .  Finally, we must review the challenged comments in the context of the entire trial, with due regard to the extent to which the objectionable remarks were invited by defense conduct or argument."  (Citations omitted; internal quotation marks omitted.)  *State v. Satchwell,* [244 Conn. 547, 710 A.2d 1348 (1998).

Although we do not condone the remarks of the state's attorney, and caution against the making of such remarks in the future, we conclude that, in the context of the entire trial, those remarks were not "so pervasive or egregious as to constitute an infringement on the defendant's [constitutional] right to a fair trial. . . ."  *Id.*  Therefore, the defendant cannot prevail on this claim.

(Footnotes omitted.)  *Floyd*, 253 Conn. at 748-49.

> ### 2.    The decision of the Connecticut Supreme Court does not constitute an unreasonable application of federal law

Before the Connecticut Supreme Court, the petitioner asserted that the prosecutor made a "missing witness" argument to the jury without first obtaining permission from the trial judge.  Appendix C at 39-40.  Those statements arose after defense counsel, during closing arguments, "urged the jury to make the inference that the charges pending against Younger provided a motivation for him to testify favorably for the state, as follows:

---

[9]    Under *Golding*, a criminal "'defendant can prevail on a claim of constitutional error not preserved at trial . . . if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt.'  *State v. Golding,* [213 Conn. 233, 239-40, 567 A.2d 823 (1989)]."  *State v. Morant,* 242 Conn. 666, 681-82 n.7, 701 A.2d 1 (1997).

48

> It seems that [all of the state's witnesses] get to talk to the police when they get arrested themselves, and they all are getting arrested for serious crimes. One of them has charges pending for a year and [one-half and] has an extensive record.  I believe he testified he had five or six prior convictions, and of those prior five or six convictions, none of his cases lasted more than a year.   Now, all of a sudden, he's not expecting any kind of special treatment here, but if he does what the state wants, his case is still pending out there, and we don't know what's going to happen to that case.  Does he have an interest in this case?  Does he have an interest in telling the story that the state would like him to tell with regard to this incident?

*Floyd I,* 253 Conn. at 729 n.20.

Subsequently, during rebuttal argument, the assistant state's attorney explained that: "'I believe that what [defense counsel is] saying is that you shouldn't believe the witnesses because they got these great deals from the state, I guess.  Well . . . where is the evidence of it . . . ? Mr. Younger's got a case pending.  Mr. Younger testified. . . . I don't have any deal.  Call his lawyer up.  Have the lawyer come down and testify.  There is no evidence at all to refute that, no evidence at all to refute that.'"  *Floyd*, 253 Conn. at 729 n.21.

At the time of the petitioner's jury trial, Connecticut state law permitted the trier of fact to draw an adverse inference from a party's failure to produce a witness or witnesses.[10] *Secondino v. New Haven Gas Co.,* 147 Conn. 672, 165 A.2d 598 (1960).  Before an attorney could *argue* to the jury that it should draw such an inference, however, certain

---

[10]    Under certain circumstances, federal courts are permitted to instruct that the jury may draw an adverse inference regarding a "missing witness." Specifically, "[w]hen 'a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction' and fails to produce such witnesses, the jury may infer that 'the testimony, if produced, would be unfavorable' to that party. . . ."  (Citations omitted.)  *United States v. Torres,* 845 F.2d 1165, 1169 (2d Cir. 1988).  This inference has been characterized as "evidentiary" in nature.  *Torres,* 845 F.2d at 1170 ("The weight of authority indicates that 'in the context of the evidentiary inference to be drawn. . . .'").

49

evidentiary and procedural hurdles had to be overcome.  "First, it must be shown that the party who declined to call the witness was in fact able to procure that witness' physical presence in court, i.e., the witness was available.  Second, under the facts of the case, it must be shown that the witness was one whom that party naturally would be expected to have testify. . . ."  (Citations omitted.)  *State v. Goodrum,* 63 Conn. App. 297, 307-08, 776 A.2d 461 (2001).  Additionally, "a prosecutor must seek and obtain an advance ruling from the trial court if he intends to argue to the jury that an unfavorable inference should be drawn from the absence of a defense witness at trial."  *State v. Clark,* 48 Conn. App. 812, 831, 713 A.2d 834 (1998).  "A prosecutor's failure to secure the trial court's permission to refer to missing witnesses, however, fails to reach constitutional magnitude."  *Id.*  Indeed, the "giving of a *Secondino* charge is purely an evidentiary issue and is not a matter of constitutional dimension. . . ."  (Citation omitted.)  *State v. Taylor,* 239 Conn. 481, 490, 687 A.2d 489 (1996).  After the petitioner's 1995-96 criminal trial, the Connecticut Supreme Court abandoned the missing witness doctrine of *Secondino* in *State v. Malave,* 250 Conn. 722, 737 A.2d 442 (1999).

A "criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial."  *United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985).  Indeed, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned. . . .  The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due

process. . . ." (Citations omitted; internal quotation marks omitted.) *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986). When undertaking such an examination, courts must be mindful that the "closing arguments of counsel are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo,* 416 U.S. 637, 646-47, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974).

Here, evidence was presented over the course of three days. The jurors heard from eleven witnesses called by the state[11] and two called by the defense.[12] The jury heard closing arguments and was charged by the trial court on December 7, 1995. The verdict was rendered on December 8, 1995. The challenged language consists of two sentences in a *rebuttal* argument that spans thirteen pages of transcript. Appendix F at 347-59. The two sentences–*i.e.,* "Call his lawyer up. Have the lawyer come down and testify"–pointed to a lack of evidence that the state's witnesses were expecting consideration for their testimony. At the time that these statements were made, Younger 's case was pending

---

[11]    On December 4, 1995, the state called John Corris, Gertrude Reboira, Alex Delgado, Ann Osika, and Richard Herlihy to testify. Appendix F at 95, 119, 146, 192, and 199. On December 5, 1995, Dr. Malka Shah, Robert K. O'Brien, Edward McPhillips, Reginald Barry, Joseph Sherbo, and Michael Younger testified for the state. Appendix G at 3, 29, 37, 54, 80, and 131.

[12]    On December 6, 1995, the defense called Eugene Floyd and Consuelo Roman to testify. Appendix F at 228 and 274.

and he had not entered into a plea agreement with the state.  Moreover, as the trial court and the Connecticut Supreme Court found, no *implied* plea agreement existed between the state and Younger.  *Floyd I,* 253 Conn. at 739.  The prosecutor noted the absence of evidence that the petitioner had received a "great deal."  He argued that Younger's attorney could have been called if the defense believed Younger lied when he testified that the state had not made him "an offer."  Appendix G at 155.

It also is important to note that the prosecutor did not ask the jury to draw an adverse inference from the petitioner's failure to call Younger's attorney.  Moreover, the petitioner's trial counsel did not object to this portion of the prosecutor's argument.  The court did not give a missing witness instruction to the jury during its charge.  Rather, it told the jury that a defendant does not have to present any evidence at all.  Appendix F at 364, 370.

For these reasons and given the context in which they occurred, the prosecutor's comments did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. . . ."  (Citations omitted; internal quotation marks omitted.)  *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986).  The prosecutor did not ask the jury to draw an adverse inference against the petitioner and his comments were brief.  Before the state courts, the petitioner did not even argue the existence of "pervasive misconduct."  The trial court advised the jury that a defendant has no obligation to produce any evidence.  Thus, the Connecticut Supreme Court's decision is neither contrary to, nor an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  As a result, the petitioner's claim must fail.

### G.    The Connecticut Appellate Court Reasonably Determined That The Petitioner Was Not Denied The Effective Assistance of Counsel

As his final claim, the petitioner asserts that his attorney "was constitutionally ineffective and his deficient performance actually prejudiced the" petitioner. Petition [Doc. # 31] at 2. Specifically, he alleges that his counsel did not (1) adequately investigate the issue of "third-party culpability," (2) introduce train tickets into evidence in support of the petitioner's alibi, (3) present the testimony of a handwriting expert, and (4) call Jose Davilla and Annette Rodriguez as witnesses. Petition [Doc. # 31] at 10. For the reasons set forth below, the petitioner cannot prevail on his claims.

### 1.    The petitioner has not exhausted any of his claims that he was denied the effective assistance of counsel

Federal habeas corpus relief "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A). Indeed, even if a petitioner can demonstrate a "clear violation" of his rights, federal relief is unwarranted unless available state remedies are exhausted. *Duckworth v. Serrano,* 454 U.S. 1, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981) (per curiam). This "exhaustion requirement springs primarily from considerations of comity." *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir. 1982). It requires that federal courts refrain from exercising "habeas review of a state conviction unless the state courts have had an opportunity to consider and correct any violation of federal law" and, thus, demonstrates "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." *Id.*

Here, the petitioner has failed to "exhaust" all of his ineffectiveness claims because he did not present them to the Connecticut Supreme Court in his petition for certification. A claim is not "exhausted" unless it has been presented to the highest state court.  *Daye*, 696 F.2d at 190 n.3.  *See also Cotto v. Herbert*, 331 A.2d 217, 237 (2d Cir. 2003) (a "petitioner satisfies the 'fair presentation' aspect of the exhaustion requirement by presenting the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it. . . ." [Citation omitted.]).  The instant petitioner did file a petition seeking discretionary review by the Connecticut Supreme Court but he only raised claims that (1) "Michael Younger had testified falsely at the the petitioner's murder trial" and (2) "the Appellate Court erred in concluding that the issue of Michael Younger's false testimony had already been decided . . . in petitioner's direct appeal." Appendix N.  No claim that he was denied his right to effective counsel was raised.

In *Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982), the High Court held "that a district court must dismiss habeas petitions containing both unexhausted and exhausted claims."  *See also Grey v. Hoke,* 933 F.2d 117, 120-21 (2nd Cir. 1991) (if a "habeas petition contains both exhausted and unexhausted claims, it must be dismissed to enable petitioner to exhaust his unexhausted claims or to file a subsequent petition dropping them"); *Pesina v. Johnson,* 913 F.2d 53, 54 (2d Cir. 1990). When confronted with a "mixed" petition, the district court must either send the petitioner "back to the state courts or afford him the opportunity to abandon his unexhausted claims and proceed only with his exhausted claims."  *Zarvela v. Artuz,* 254 F.3d 374, 378 (2d Cir.

54

2001).  The instant petition contains three unexhausted claims.  Normally, the court would be required to dismiss the petition.

Nevertheless, despite such lack of exhaustion, § 2254(b)(2) permits the Court to *deny* this claim "on the merits, not withstanding the failure of the applicant to exhaust the remedies available in the courts of the state."[13]  "[T]here exists no complementary power to grant a habeas petition on an unexhausted claim.  *Aparicio v. Artuz,* 269 F.3d 78, 90 n.5 (2d Cir. 2001).

### 2.    The *Strickland* standard

Under AEDPA, a court begins analyzing a claim "by determining the relevant clearly established law" which is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision. . . ."  (Citation omitted.) *Yarborough v. Alvarado,* 541 U.S. 652, 660-61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004).   Here, the state habeas court appropriately identified the "governing legal principles"  and resolved the petitioner's claim in accordance with the Supreme Court's 1984 decision in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Strickland*, the Court explained that to establish a denial of the right to the effective assistance of counsel, a petitioner must demonstrate: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

---

[13]    The respondent does not waive the exhaustion requirement to permit the granting of this "mixed" petition–*i.e.,* a petition containing both exhausted and unexhausted claims. *See* 28 U.S.C. § 2254(b)(3).

In deciding whether a petitioner has satisfied the first prong of *Strickland*, courts must decide whether counsel's performance fell below the reasonable competence exhibited by lawyers with ordinary training and skill in criminal law.  In other words, the question is whether counsel's acts or omissions were "outside the wide range of professionally competent assistance" or failed to meet "prevailing professional norms." *Strickland*, 446 U.S. at 690, 104 S.Ct. at 2066.  Flawlessness is not required.  The right to counsel is the right to effective assistance and not the right to perfect representation.

To satisfy the "prejudice" requirement, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  Thus, when a petitioner challenges his conviction on the ground of ineffective assistance of counsel, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.

### 3. The petitioner's counsel was not ineffective for failing to investigate the issue of third-party culpability

The petitioner first asserts that his attorney "did not adequately investigate the potentially exculpatory information as to third party culpability."  Petition [Doc. # 31] at 10. The petitioner presented this claim to the state habeas court and again to the Connecticut Appellate Court.  Both courts rejected this claim.  For the reasons set forth below, the decision of the state courts is not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Therefore, the claim must fail.

56

The Connecticut Appellate Court resolved the petitioner's claim that counsel's investigation was inadequate, as follows:

> The petitioner first claims that the court improperly concluded that his trial counsel rendered effective assistance. The petitioner argues that [his former attorney, Paul M. Tymniak,] failed to investigate, to develop and to pursue adequately a third party culpability defense when he received information suggesting that other individuals were involved in the shooting. We are not persuaded.

> * * *

> In the present case, the court denied the petition because the petitioner failed to meet his burden of proving the prejudice prong of *Strickland*. It reasoned: "[T]here is no question that the three witnesses [to the crime, Delgado, Reginald Berry and Michael Younger], who identified the petitioner as the shooter of the victim, were severely damaging to the petitioner's case. The jury apparently believed them, and with this eyewitness testimony, despite any alleged errors on the part of attorney Tymniak, testimony of these three eyewitnesses would have been sufficient for conviction and, therefore, the petitioner has not sustained his burden of proving that if it were not for the ineffectiveness of trial counsel, there is a reasonable probability that the outcome of the trial would have been different."

> At the habeas hearing, the petitioner alleged that he was prejudiced by Tymniak's failure to investigate adequately the possibility that other individuals had been responsible for the shooting, following the disclosure of certain documents prior to trial. Specifically, he claims that Tymniak should have investigated (1) the statement made by an informant that two individuals associated with a gang, "Ito" and "Alex," were involved in the shooting, and (2) the statement made by Luis Troncoso that a man in a yellow house across the street had identified the shooters as "Jimmy" and "Jeff." Moreover, the petitioner argues that he was prejudiced by Tymniak's failure to call two witnesses at the trial, Jesus Davila, who would have testified that Delgado had implicated two different individuals in the murder, and "Mickey," who was identified as a participant in the murder by Younger and the victim's brother, Auggie Avellanet. As stated, however, by the court: "There is no evidence that [the petitioner] could have located any of these witnesses and, if he had, whether they would have talked to him. These individuals were other drug dealers, some of them members of [a] gang, and

it is highly unlikely that they would have given him any worthwhile information."

The jury found the petitioner guilty after hearing testimony from three eyewitnesses who identified him as the shooter. Delgado indicated that the petitioner had a nine millimeter gun. Evidence presented at trial revealed that a nine millimeter bullet was found in the victim's body. The petitioner's argument that he established prejudice through the testimony of his expert witness is unpersuasive. We agree with the court that the petitioner's counsel could not have presented Troncoso to testify that "Jimmy" and "Jeff" were the shooters because the information would have been inadmissible hearsay. Moreover, we agree that Lopez and anyone else who was implicated in the shooting would have been advised by any competent attorney not to testify pursuant to their rights under the fifth amendment.

"The burden to demonstrate what benefit additional investigation would have revealed is on the petitioner." *Holley v. Commissioner of Correction,* 62 Conn. App. 170, 175, 774 A.2d 148 (2001). "Mere conjecture and speculation are not enough to support a showing of prejudice." *Burke v. Commissioner of Correction,* 90 Conn. App. 370, 378, 877 A.2d 885, cert. denied, 275 Conn. 926, 883 A.2d 1241 (2005). Because the petitioner failed to prove that the witnesses were available to testify at trial, what they would have testified about or that their testimony would have had a favorable impact on the outcome of the trial, we agree with the court that his claim of ineffective assistance must fail. See, e.g., *Ostolaza v. Warden,* 26 Conn. App. 758, 766-67, 603 A.2d 768, cert. denied, 222 Conn. 906, 608 A.2d 692 (1992); *Henry v. Commissioner of Correction,* 60 Conn. App. 313, 321, 759 A.2d 118 (2000).

(Footnotes omitted.)  *Floyd II,* 99 Conn. App. at 529-33.

Here, the Connecticut Appellate Court determined that the petitioner did not demonstrate that prejudice resulted from his attorney's alleged failure to adequately pursue a defense of third-party culpability.[14]  Specifically, the court found that the petitioner failed "to prove that the witnesses were available to testify at trial, what they would have testified

_____

[14]  The petitioner's trial counsel, Paul Tymniak, died before the habeas trial commenced and his file could not be located.

about or that their testimony would have had a favorable impact on the outcome of the trial. . . ." *Floyd II*, 99 Conn. App. at 532.  Absent such evidence, the Connecticut Appellate Court held that the petitioner's "claim of ineffective assistance must fail."

Given the lack of evidence presented to the state habeas court, this determination does not constitute an unreasonable application of *Strickland*.  Indeed, federal courts have repeatedly stressed that claims challenging counsel's decision *not* to call a particular witness or *not* to pursue a particular investigation cannot be proven absent evidence showing what the witness would have said or what the investigation would have uncovered. *Cross v. O'Leary*, 896 F.2d 1099, 1100 (7th Cir. 1990) *quoting United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987).  *See also Lawrence v. Armontrout*, 900 F.2d 127, 130 (8th Cir. 1990) (petitioner must demonstrate that the testimony of "uncalled witnesses would have been favorable" and that the "witnesses would have testified at trial"); *United States v. DeBango,* 780 F.2d 81, 86 (D.C. Cir. 1986) (absent evidence of what the missing witness "would have said had trial counsel located him," defendant lacks support for his assertion that he "was prejudiced by counsel's failure to locate" the witness); *Alexander v. McCotter,* 775 F.2d 595, 602 (5th Cir. 1985).

*Strickland* requires that a petitioner demonstrate both deficient performance and prejudice. Thus, absent admissible evidence of third-party culpability, the petitioner cannot prevail because he has not demonstrated prejudice–*i.e.,* what evidence a competent investigation would have produced.  For this reason, alone, he cannot demonstrate that his attorney was ineffective.  As a result, the decision of the Connecticut Appellate Court is not an unreasonable application of *Strickland* and the petitioner's claim must fail.

4.    The petitioner's counsel was not ineffective for failing
to introduce train tickets into evidence in support of the
petitioner's alibi defense

The petitioner next asserts that his attorney "failed to introduce into evidence the train tickets that the defendant had used to travel out of state when the murder was committed." Petition [Doc. # 31] at 10. The petitioner presented this claim to the state habeas court but did not pursue the claim on appeal. Thus, he has not exhausted this issue and relief is unwarranted.

Nevertheless, even if reviewed on its merits, the petitioner could not prevail. After hearing the petitioner's evidence on this claim, the state habeas court made the following findings:

> Floyd's father and Consuelo Roman for whom the party was given testified in the criminal trial that the Petitioner was at a party ion Leominster, Massachusetts at the time of the killing. Apparently, the jury did not believe them. At the habeas trial, the Petitioner's father testified as to whether or not he gave train tickets to Attorney Tymniak. However, there is no credible evidence that the Petitioner used the train tickets to go to Massachusetts and/or when he went to Massachusetts, if he did. This Court does not find Attorney Tymniak ineffective as to an alibi defense.

Appendix J at 22.

Here, the state habeas court determined that no credible evidence supported findings that the petitioner (1) used the train tickets and (2) went to Massachusetts. Absent credible evidence, the petitioner cannot establish that his attorney was ineffective for failing to offer the tickets. These credibility findings are presumed to be correct. 28 U.S.C. § 2254(e)(1). Indeed, the presumption is "particularly important when reviewing the trial court's assessment of witness credibility. . . ." (Citation omitted.) *Cotto v. Herbert*,

331 F.3d 217, 233 (2d Cir. 2003).  Thus, absent clear and convincing evidence, the petitioner cannot demonstrate that these findings are unreasonable.

Absent credible evidence that he was in Massachusetts, the petitioner cannot demonstrate that counsel's alleged failure to offer the train tickets resulted in prejudice. As a result, the state habeas court's decision cannot be deemed contrary to, or an unreasonable application of *Strickland v. Washington* and the petitioner's claim must fail.

**5.    The petitioner's counsel has not exhausted his claims that counsel was ineffective for failing to retain a handwriting expert**

Next, the petitioner asserts that his attorney should have presented the testimony of a handwriting expert.  Again, however, the petitioner failed to exhaust this claim in the state courts of Connecticut.  As a result, he is not entitled to review of, or relief upon, this claim.

Federal habeas corpus relief "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ."  28 U.S.C. § 2254(b)(1)(A).  In order to satisfy the exhaustion requirement, "'[i]t is not sufficient merely that the [petitioner] has been through the state courts.' . . .  Rather the petitioner's claims must be fairly presented so the that state has the opportunity to correct any alleged constitutional violations. . . ."  (Citations omitted.)  *Ellman v. Davis,* 42 F.3d 144, 147 (2d Cir. 1994). Indeed, the U.S. Supreme Court has explained that to "protect the integrity of the federal exhaustion rule, we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.,* whether he has fairly presented his claims to the state courts. . . ."  (Emphasis in original.)  *O'Sullivan*

*v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999).  "A petitioner meets the fair presentation requirement if the state court rules on the merits of his claims, or if he presents his claims in a manner that entitles him to a ruling on the merits."  *Gentry v. Lansdown,* 175 F.3d 1082, 1083 (8th Cir. 1999) *citing Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 1060, 103 L.Ed.2d 380 (1989).  *See also Howard v. Sullivan,* 185 F.3d 721, 725 (7th Cir. 1999) (fair presentment "requires the petitioner to have given the state courts a meaningful opportunity to pass upon the substance of the claims she later presses in federal court").  A petitioner has "fairly presented" a claim if he has "'informed the state court of both the factual and the legal premises of the claim he asserts in federal court.'  *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir. 1982) (en banc). To have done so, the petitioner 'must have set forth the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim.'  *Id.*"  *Dorsey v. Kelly,* 112 F.3d 50, 52 (2d Cir. 1997).

In the instant case, the petitioner's claim that counsel was ineffective for failing to present the testimony of a handwriting expert has not been exhausted in the state courts *for the additional reason that it has not been "fairly presented" to those courts.*  In the state courts, he did claim that his counsel was ineffective, but that claim addressed counsel's failure to assert a third-party culpability defense.  As a result, he has not "fairly presented" a handwriting-expert claim to the state courts because he did not inform them of the factual basis for such a claim.

62

Nevertheless, despite such lack of exhaustion, § 2254(b)(2) permits the Court to *deny* this claim "on the merits, not withstanding the failure of the applicant to exhaust the remedies available in the courts of the state."[15]  Even if reviewed on the merits, however, the petitioner cannot prevail.

Here, the witnesses who testified at the state habeas trial included: (1) the petitioner; (2) his father; (3) Attorney Norman Pattis, who testified as an expert in the area of criminal defense; (4) his prior appellate counsel, Attorney Neal Cone; (5) a payroll clerk; (6) the prosecutor, Attorney C. Robert Satti, Jr.; and (7) Sergent Sherbo of the Bridgeport Police department.  No handwriting expert testified.  Nevertheless, evidence about a handwriting expert was described by the petitioner in his brief to the Connecticut Appellate Court.  There, the petitioner wrote: "Josephine Benedict, the accounts payable clerk from the Office of the Chief Public Defender, identified billing and expense records submitted by [the petitioner's trial counsel, Attorney Paul Tymniak,] in connection with his work as a special public defender representing [the petitioner] in the Avellant murder case.  Those records indicate that Attorney Tymniak submitted an Authorization to Incur expenses to hire a handwriting analyst to review the signature on Reginald Berry's statement.  No other authorizations to incur expenses were submitted."  Appendix K at 6-7.  During the state habeas proceedings, the petitioner used these financial records to demonstrate that his trial counsel (1) did not hire an investigator and (2) knew that he could apply to the Public Defender's Office for funds sufficient to hire an investigator.  Appendix K at 7, 9, 11.

---

[15]    The respondent does not waive the exhaustion requirement to permit the granting of this "mixed" petition–*i.e.,* a petition containing both exhausted and unexhausted claims. *See* 28 U.S.C. § 2254(b)(3).

Given that the petitioner did not present the testimony of a handwriting expert, this Court has no evidence upon which it could find that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the petitioner.  At a minimum, he would have to call a handwriting expert and establish that such expert could have provided favorable testimony.  Absent such evidence, the petitioner lacks even an arguable basis to support of his claim and it must fail completely.  For these reasons, the petitioner's claim must be denied.

  **6. The petitioner's counsel was not ineffective for failing to present the testimony of Jose Davilla and Annette Rodriguez**

Next, the petitioner asserts that his attorney should have presented the testimony of Jose Davilla and Annette Rodriguez as witnesses at his 1995-96 criminal trial.  Petition [Doc. # 31].  As with the prior claim, the petitioner did not exhaust this allegation in the state courts of Connecticut *for the additional reason that it has not been "fairly presented" to those courts.*  In the state courts, he did raise a claim that his counsel was ineffective but did not pursue a claim alleging that counsel failed to call these two individuals to testify. As a result, he has not "fairly presented" this claim to the state courts because he did not inform them of the factual basis for such a claim.  As a result, he is not entitled to review of, or relief upon, this claim.

Nevertheless, despite such lack of exhaustion, § 2254(b)(2) permits the Court to *deny* this claim "on the merits, not withstanding the failure of the applicant to exhaust the remedies available in the courts of the state."[16]  Even if reviewed on the merits, however,

---

[16] The respondent does not waive the exhaustion requirement to permit the granting of this "mixed" petition–*i.e.,* a petition containing both exhausted and unexhausted claims.

the petitioner cannot prevail.   Neither Davilla nor Rodriguez testified at the state habeas trial.   Thus, the substance of their potential testimony is unknown and this Court has no evidence upon which it could find that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the petitioner. Absent such evidence, the petitioner lacks even an arguable basis to support of his claim and it must fail completely.   For these reasons, the petitioner's claim must be denied.

### 7.    The remaining allegations of ineffectiveness fail because the petitioner did not demonstrate prejudice

Finally, the petitioner asserts that his attorney should have (1) requested a continuance when the state disclosed  Troncoso's statement, (2) requested a continuance or a mistrial when the state disclosed Younger's statement, and (3) sought disclosure of the identity of a confidential informant.  Petition [Doc. # 31] at 10.  None of these claims have been presented to the state courts.  Nevertheless, even if he had done so, he could not prevail because he has failed to establish prejudice.

Here, the petitioner raises a number of allegations against counsel's performance. Even if he could demonstrate that counsel's omissions constituted deficient performance, he has not established that he was prejudiced by such omissions.  In order to demonstrate prejudice, the petitioner would have to present evidence of (1) the  information he would have uncovered during a continuance or (2) the information he would have uncovered upon learning the identity of the confidential informant.   He has done neither and, therefore, cannot establish prejudice.  As a result, his claim fails and he is not entitled to relief.

---

*See* 28 U.S.C. § 2254(b)(3).

## IV.    CONCLUSION

As demonstrated above, the petitioner is not in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  Therefore, his claim for relief should be denied and his petition for writ of habeas corpus dismissed.

Respectfully submitted,

RESPONDENT--BRIAN MURPHY


By:    _____
JO ANNE SULIK
Senior Assistant State's Attorney
Civil Litigation Bureau
Office of the Chief State's Attorney
300 Corporate Place
Rocky Hill, Connecticut 06067
(860) 258-5887
(860) 258-5968 (facsimile)
Fed. Bar. No. ct 15122




### CERTIFICATION

I hereby certify that a copy of this document was mailed to Eric Floyd, Inmate No. 155356, MacDougall Correctional Institution, 1153 East Street South, Suffield, Connecticut 06080, on August 22, 2007.


_____
JO ANNE SULIK
Senior Assistant State's Attorney